UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

APPEAL NO. 23-1337


UNITED STATES OF AMERICA,
Appellee,


v.


CARL LANGSTON
Defendant-Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

---

BRIEF AND ADDENDUM OF APPELLANT CARL LANGSTON

---

ROBERT HERRICK, ESQUIRE
Attorney for Carl Langston
PO Box 400143
Cambridge, Massachusetts 02140
Tel: (857) 331-0847
Email: rherricklaw@gmail.com
Bar No. 119803

TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................iii

JURISDICTIONAL STATEMENT............................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW........1

STATEMENT OF THE CASE...............................2

STATEMENT OF THE FACTS RELEVANT TO THE ISSUE
    PRESENTED FOR REVIEW..............................4

SUMMARY OF ARGUMENT................................18

ARGUMENT..........................................20

I.   THE DEFENDANT'S CONVICTION VIOLATES THE SECOND
    AMENDMENT OF THE FEDERAL CONSTITUTION..............20

    A.    Standard of Review...........................20

    B.    Since The Felon-in-Possession Statute Violates
        the Second Amendment As Applied to Langston, The
        District Court's Judgment Must Be Vacated......21

II.  The District Court Erred In Denying The Defendant's
    Motion to Suppress, Because The Portland Police Did
    Not Have Reasonable Suspicion To Detain Him. The
    Fruits of the Unlawful Seizures Should Have Been
    Suppressed........................................24

    A.    Standard of Review...........................25

    B.    Officers Lacked Reasonable Suspicion To Believe
        That Langston Was Committing A Crime When They
        Tackled Him, Because They Acted On A Tip That Not
        Only Consisted Of Hearsay But Also Failed To
        Allege A Crime................................26

III. THE DISTRICT COURT PLAINLY ERRED BY ADDING A FOUR-
    LEVEL ENHANCEMENT TO LANGSTON'S OFFENSE LEVEL FOR
    POSSESSION OF A FIREARM WHILE COMMITTING A FELONY,
    WHEN THE ARRESTING OFFICERS TESTIFIED THAT HIS ONLY
    CRIME WAS THE MISDEMEANOR OF FAILING TO SUBMIT TO
    DETENTION.........................................31

A. Standard of Review...............................31

B. The District Judge's Finding That Langston
   Unlawfully Possessed a Firearm While Committing a
   Felony Is Plainly Erroneous......................32

IV.  THE DISTRICT COURT ABUSED ITS DISCRETION BY FINDING THAT
     LANGSTON HAD NOT ACCEPTED RESPONSIBILITY FOR HIS OFFENSE
     CONDUCT..............................................37

A. Standard of Review...............................37

B. The District Court Clearly Erred By Concluding That
   Langston Did Not Accept Responsibility For His
   Offense Conduct..................................38

V.   THE DISTRICT COURT COMMITTED A SERIOUS PROCEDURAL
     ERROR BY ADMITTING, OVER OBJECTION, HEARSAY EVIDENCE
     TO SUPPORT ITS FINDING THAT THE DEFENDANT VIOLATED THE
     CONDITIONS OF PRETRIAL RELEASE......................42

A. Standard of Review...............................42

B. The District Court Erroneously Relied Upon
   Untrustworthy Hearsay Evidence To Support A Key
   Finding Of Fact On A Disputed Issue At Sentencing.43

CONCLUSION.........................................50

CERTIFICATE OF COMPLIANCE..........................51

CERTIFICATE OF SERVICE.............................51

ADDENDUM TABLE OF CONTENTS.........................52

TABLE OF AUTHORITIES

*CASES*

Alabama v. White,
    496 U.S. 325 (1990)................................27

In re Baldoumas Enters., Inc.,
    829 A.2d 1056 (N.H. 2003).........................48

Brown v. Plata,
    563 U.S. 493 (2011)...............................38

Florida v. J.L.,
    529 U.S. 266 (2000)...........................27, 28

Gutierrez v. Kermon,
    722 F.3d 1003 (7th Cir. 2013).....................45

Illinois v. Wardlow,
    528 U.S. 119 (2000)...............................27

Miles v. United States,
    181 A.3d 633 (D.C. App. 2018).....................27

Miller v. Sanilac Cnty.,
    606 F.3d 240 (6th Cir. 2010)......................46

Muir v. Danner,
    479 F.Supp.3d 683 (M.D. Tenn. 2020)...............46

N.Y. State Rifle & Pistol Ass'n v. Bruen,
    142 S. Ct. 2111 (2022)..........18, 20, 21, 22, 23, 24

Range v. Attorney Gen. United States,
    69 F.4th 96 (3d Cir. 2023)............21, 22, 23, 24

Rosales-Mireles v. United States,
    138 S. Ct. 1897 (2018)........................36, 37

State v. Morey,
    427 A.2d 479 (Me. 1981)...........................34

Terry v. Ohio,
    392 U.S. 1 (1968).........................24, 26, 27

United States v. Acevedo-López,
      873 F.3d 330 (1st Cir. 2017)........................44

United States v. Booker,
      644 F.3d 12 (1st Cir. 2011)........................23

United States v. Cannon,
      589 F.3d 514 (1st Cir. 2009).......................32

United States v. Cortez,
      449 U.S. 411 (1981)................................33

United States v. Duarte,
      246 F.3d 56 (1st Cir. 2001)........................36

United States v. Ferreras,
      192 F.3d 5, 10 (1st Cir. 1999).....................25

United States v. Harrington,
      56 F.4th 195 (1st Cir. 2022).......................25

United States v. Hensley,
      469 U.S. 221 (1985)................................33

United States v. Hooten,
      942 F.2d 878 (5th Cir. 1991)...................40, 41

United States v. Iwuanyanwu,
      69 F.4th 17 (1st Cir. 2023)........................42

United States v. Kitts,
      27 F.4th 777 (1st Cir. 2022).......................43

United States v. MacArthur,
      805 F.3d 385 (1st Cir. 2015).......................32

United States v. Matos,
      531 F.3d 121 (1st Cir. 2008).......................20

United States v. McCarthy,
      32 F.4th 59 (1st Cir. 2022).................38, 38, 39

United States v. McLaughlin,
      378 F.3d 35 (1st Cir. 2004).............37, 39, 40, 41

United States v. Monteiro,
      447 F.3d 39 (1st Cir. 2006)........................30

United States v. Nichols,
      897 F.3d 729 (6th Cir. 2018).........................21

United States v. Pennue,
      770 F.3d 985 (1st Cir. 2014)....................21, 32

United States v. Ponotoo,
      666 F.3d. 20 (1st Cir. 2011).........................33

United States v. O'Brien,
      870 F.3d 11 (1st Cir. 2017).........................43

United States v. Ramírez-Negrón,
      751 F.3d 42 (1st Cir. 2014).........................44

United States v. Rodríguez,
      336 F.3d 67 (1st Cir. 2003).........................44

United States v. Romero,
      896 F.3d 90 (1st Cir. 2018)....................35, 36, 37

United States v. Tann,
      577 F.3d 533 (3d Cir. 2009).........................21

United States v. Tiru-Plaza,
      766 F.3d 111 (1st Cir. 2014).........................25

United States v. Torres-Rosario,
      658 F.3d 110 (2011)................................23

United States v. Tracey,
      675 F.2d 433 (1st Cir. 1982).........................44

Wong Sun v. United States,
      371 U.S. 471 (1963)...........................25, 31

*FEDERAL CONSTITUTIONAL AMENDMENTS*

Second Amendment....................................PASSIM

Fourth Amendment.......................................26

### FEDERAL STATUTES

18 U.S.C. § 921.........................................5

18 U.S.C. § 922..................................1, 2, 24

18 U.S.C. § 924......................................1, 2

18 U.S.C. § 3231........................................1

28 U.S.C. § 1291........................................1

### SENTENCING GUIDELINE PROVISIONS

U.S.S.G. § 2K2.1............................11, 12, 31, 32

U.S.S.G. § 3C1.1.......................................14

U.S.S.G. § 3E1.1............................12, 38, 39

U.S.S.G. § 4A1.1.......................................12

U.S.S.G. § 4A1.2.......................................13

U.S.S.G. Ch. 5, Pt. A..................................37

### FEDERAL RULES OF COURT

Fed. R. App. P. 4.......................................1

### STATE STATUTES

Me. Rev. Stat. Tit. 17-A § 353.........................23

Me. Rev. Stat. Tit. 17-A § 751-B.......................36

Me. Rev. Stat. Tit. 17-A § 752-A.......................33

Me. Rev. Stat. Tit. 25 § 2001-A........................30

N.H. Rev. Stat. ch. 172-B:1............................45

N.H. Rev. Stat. ch. 172-B:3............................45

JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this case pursuant to 18 U.S.C. § 3231, because the indictment charged Appellant Carl Langston (Langston) with violations of laws of the United States. Specifically, Langston was charged with unlawful possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2)(1). Add. 10-11.[1]

The district court entered a judgment of conviction on March 30, 2023. Add. 3-9. Langston filed a notice of appeal on April 6, 2023. Add. 1. Accordingly, this appeal is timely under Fed. R. App. P. 4(b)(1)(A).

The Court of Appeals has final jurisdiction over this case pursuant to 28 U.S.C. § 1291 because Langston appeals from the final judgment of conviction of the district court.

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Does the Defendant's felon-in-possession conviction violate the Second Amendment where the predicate offenses were nonviolent?

2. Did the district court err in denying the Defendant's motion to suppress where police officers detained the

---

[1] Langston's addendum and appendix will be cited as "Add. [page]" and "App. [volume]/[page]," respectively.

Defendant in response to reports that he was engaged in a facially lawful activity, i.e., carrying a concealed handgun in Maine?

3. Did the district court commit plain error by finding that the Defendant unlawfully possessed a firearm while committing a felony where police officers on scene only found probable cause to arrest him for a misdemeanor?

4. Did the district court commit clear error by denying the Defendant a three-level adjustment for acceptance of responsibility in light of the court's finding of a violation of the conditions of release unrelated to gun possession?

5. Did the district court err by relying on untrustworthy hearsay statements in finding that the Defendant violated his conditions of release and thereby failed to accept responsibility for his offense conduct?

## STATEMENT OF THE CASE

On October 21, 2021, Langston was indicted on a charge of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2)(1). App. 1-4. The indictment alleged that Langston was a felon due to his prior state convictions for unlawful trafficking in scheduled drugs and theft by unauthorized taking or

transfer. <u>Id</u>. Represented by counsel, Langston filed a motion to suppress the firearm, magazine and ammunition as well as any statements made at the time of his arrest. App. 13-20.

District Judge George Z. Singal presided over an evidentiary hearing on the motion to suppress on June 2, 2022. Add. 14. In an order dated June 29, 2022, Judge Singal denied Langston's motion to suppress. Add. 14-30.

Langston and the Government filed a conditional plea agreement on November 21, 2022. Add. 12-13. The plea agreement did not include a waiver of appellate rights. <u>Id</u>. Langston tendered a guilty plea the same day. App. 11.

At a sentencing hearing held on March 30, 2023, Judge Singal sentenced Langston to 57 months of incarceration. <u>Id</u>. He further imposed a term of 3 years of supervised release. <u>Id</u>. Langston filed a timely notice of appeal. Add. 1.

STATEMENT OF THE FACTS
RELEVANT TO THE ISSUE PRESENTED FOR REVIEW

*The Offense*[2]

On about February 7, 2021, members of the Portland
Police Department (PPD) responded to a report that an
individual involved in a physical altercation earlier in
the evening was on scene and in possession of a firearm.
PPD officers encountered a person on the street matching
the description of the individual who was later identified
as Defendant, Carl Langston. As the PPD officers approached
Langston, he failed to comply with their orders to place
his hands on his head. He was subsequently handcuffed and
searched. During the search, a handgun was recovered from
Langston's right jacket pocket along with a loaded
Springfield XDS magazine, a cellphone, and other personal
items.

The firearm recovered from Langston's jacket pocket
was identified as a Springfield Armory (HS Produkt) .45
caliber pistol, model XDS, bearing serial number HG135281.
At the time of Defendant's arrest, he knew he was convicted
on about June 27, 2012, of Unlawful Trafficking in

---

[2] The following summary of the offense conduct derives from
the prosecution version of events. See App. 21-22.
Langston admitted that he committed the offenses alleged in
the indictment. App. 160-162.

Scheduled Drugs, in Cumberland County Unified Criminal
Court, Docket Number CUMCD-CR-2011-05779, receiving a
sentence of 26 months imprisonment. Langston also knew he
was convicted on about April 6, 2009, of Theft by
Unauthorized Taking or Transfer, in Cumberland County
Superior Court, Docket Number PORSC-CR-2008-02515,
receiving a sentence of three years imprisonment, with all
but sixteen months suspended, followed by two years of
probation. As a result of these convictions, Langston was
prohibited from possessing firearms. At the time Langston
possessed the firearms, he knew that he had been previously
convicted of these crimes.

Langston had actual and/or constructive possession
over the seized firearm. The Springfield Armory (HS
Produkt) .45 caliber pistol, model XDS, bearing serial
number HG135281 is a firearm as defined in Title 18, United
States Code, Section 921(a)(3). The government's evidence
would include that the firearm was manufactured outside the
State of Maine. As a result, the firearm traveled in or
affected interstate commerce prior to being possessed by
Defendant in the State of Maine.

*Motion to Suppress Hearing*[3]

---

[3] The following summary of the evidence reflects the
district court's findings of facts relating to the

On the night of Saturday, February 6, 2021, Portland's Old Port neighborhood, home to many bars and restaurants, was busy. Pandemic-related restrictions on the hours of operation for many Old Port establishments had recently been lifted. As a result, the Portland Police Department ("PPD") was on alert given the neighborhood's reputation as an area prone to calls relating to alcohol consumption and physical violence.

Shortly before midnight, the PPD received a 911 call from a then-anonymous tipster reporting a disturbance outside The Bar, a bar located at 8 Exchange Street in the Old Port. According to dispatch, the tipster stated that "a Black male wearing a black hat with horns ... [was] yelling and had punched a white male that had a beard .... [T]he male that was punched is gone now but the black male was still outside yelling." The tipster reportedly observed events from his apartment.

PPD officers Garrick Rogers and Ryan Cannell were dispatched to the scene, arriving within a few minutes. Upon their arrival, the officers did not observe an active disturbance or anyone matching the description provided. They spoke to a security guard (or "bouncer") at The Bar,

lawfulness of police officers' seizure of Langston and the firearm. Add. 14-19.

which appeared relatively crowded. It was not uncommon for the officers to rely on information provided by such guards, who are able to keep their eyes on customers throughout the night and note potential issues. The guard confirmed there had been an altercation but believed that a recurrence was unlikely unless the participants encountered each other again somewhere else that night. Officer Rogers credited the guard's account and, roughly at midnight, radio dispatch that everything was calm at The Bar and there was no sign of a disturbance. Rogers and Cannell then departed the scene.

Soon after the officers cleared the call, the same tipster called 911 again, this time identifying himself as "Shawn" and providing his phone number and an apartment address of 11 Exchange Street. At this point, Shawn stated that the man "that started the fight" was "still in the bar."

Minutes later, the PPD received a 911 call from The Bar's manager who was not on-site conveying a report he had received from his on-site security guard. Based on this third hand report, dispatch relayed the following information over the radio:

> One of the males involved in the fight went to his car and grabbed a 1032 gun. He's now looking for another male that he was fighting with. They said he had a

pistol in his coat. Black male, 5'10", maroon jacket
with a grey hood. He's currently outside the bar with
his hand in his pocket.

Dispatch also relayed a report of a large group of people
in the area. Rogers and Cannell were again dispatched to
the scene, along with PPD Officer Zachary Theriault.

Within several minutes of the receipt of the manager's
call, the officers began to arrive outside The Bar. Officer
Rogers parked his vehicle and approached The Bar from the
corner of Fore Street and Exchange Street. He saw an
individual matching the description that had been provided
via the relayed 911 calls: Black, 5'10", wearing a hat with
an embroidered horn design, and dressed in a maroon jacket
over a grey hoodie. This individual, who was later
identified as Carl Langston, appeared to be arguing with
another individual in a light grey jacket outside the bar.

The man in the light grey jacket, who was later
identified as Colton Carr, appeared to be blocking
Langston's path into The Bar and had his hand on Langston
when turn began pushing against him and toward the
entrance. At this point, Langston's hands were not in his
pockets. As he approached, Rogers called out to Langston,
"Put your hands on your head." Langston turned towards

Rogers. The officer modeled what he wished Langston to do, placing his hands on his own head. Langston replied, "Who?"

Rogers repeated his command. Retreating slightly from the officer, Langston replied, "Nah." At this point, Langston was holding his right arm close against his body across his right jacket pocket, where Roger suspected a gun was located based on the report from dispatch. Rogers believed Langston was attempting to keep the gun from moving around or being visible to the officer. Rogers repeated his commands at least twice more, and Langston continued to refuse.

While Langston was refusing to follow Rogers's directions, officer Theriault approached The Bar from the opposite direction, having parked his cruiser near the intersection of Milk Street and Exchange Street. Theriault, too, found Langston to match the description provided by dispatch. He perceived Langston as agitated and thought that Carr was trying to calm him down or keep him out of The Bar. As he approached, Theriault perceived Langston as refusing to comply with Rogers's commands. Because he was approaching from behind, Theriault could not see Langston's hands, so he believed Langston's hands were in his jacket pockets. Based on the prior information that the individual

in question was armed, Theriault was concerned that
Langston might pull a weapon from his pocket.

At this point, Langston backpedaled such that he was
within arms-reach of Theriault. As Langston turned around
and discovered a second officer on the scene, Theriault
immediately grabbed Langston's right wrist and shoulder in
order to deny him the opportunity to reach for a weapon.[4]
Langston attempted to break the officer's hold and pull
away. As this happened, Rogers also grabbed onto Langston,
who continued to struggle. Theriault then deliberately
dropped to the ground, bringing Langston down on top of
him. As the three men continued to struggle on the ground,
the officers believed that Langston was attempting to bring
his hands to the front of his body, toward where they
believed a gun was potentially located. They endeavored to
keep Langston's hands behind him.

During this time officer Cannell arrived on the scene
and began assisting his colleagues in subduing Langston. At
various points during the struggle, the officers directed
Langston to stop resisting, to put his hands behind his

---

[4] Langston notes that Officer Theriault's own testimony
refutes the finding that Langston "discovered a second
officer on the scene" before Theriault grabbed Langston
from behind. Add. 17. Theriault testified, "I am very
confident that [Langston] had no idea I was behind him" before
the officer "grabbed on to his right wrist and the back of his
right arm." App. 82.

back, and to get on his stomach. He did not comply with these commands. After about a minute, the officers gained control of Langston's person and Officer Rogers handcuffed him. During this struggle, officer Theriault sustained an abrasion on his knee.

At this point, Theriault, still partially entangled with Langston, noted the grip of a pistol in plain view in Langston's right pocket. Officer Rogers also saw the weapon. The officers secured the pistol and proceeded to search Langston's person for other weapons. Langston, now in handcuffs, was then walked to Theriault's cruiser. After adjusting Langston's handcuffs in response to his complaints that they were too tight, Theriault conducted a more thorough search of Langston's person, which yielded an additional loaded magazine.

Langston was arrested for refusing to submit to arrest or detention in violation of 17-A Me. Rev. Stat. § 751-B. Although he refused to identify himself to the responding officers, Langston was later identified by jail staff.

*The Presentence Investigation Report*

In a revised Presentence Investigation Report ("PSI") filed on February 9, 2023, the Probation Officer opined that Langston's offense conduct yielded a base offense level of 14. App. 262, citing U.S.S.G. § 2K2.1(a)(6)(A).

The Probation Officer added four levels under U.S.S.G. § 2K2.1(b)(6)(A) due to Langston's possession of a firearm "during felony Assault on an Officer." Id. Langston's adjusted offense level totaled 18. Id.

The Probation Officer concluded that Langston "clearly demonstrated acceptance of responsibility" for the offense and proposed a three-level decrease under U.S.S.G. § 3E1.1(a)&(b). Id. Langston's total offense level therefore fell to 15. Id.

Turning to Langston's criminal history, the Probation Officer concluded that Langston's prior convictions generated a criminal history of 16 points. App. 270. His commission of the offense while under a criminal justice sentence on another matter boosted his criminal history score to 18 points. App. 270-71, citing U.S.S.G. § 4A1.1(d). Langston's criminal history score placed him in Category VI. App. 280.

Langston's total offense level and criminal history yielded a Guideline imprisonment range of 41 months to 51 months. Id. The Probation Officer opined that Langston presented potential grounds for both an upward departure and a below guideline sentence. App. 281. Specifically, the PSI suggested that Langston's criminal history computation may understate the seriousness of his criminal history,

Id., citing U.S.S.G. § 4A1.2(a). Conversely, it noted that
Langston had "a disadvantaged childhood given his absent
father, alcoholic mother, and a sick sibling who ultimately
died." App. 282. Furthermore, he was placed in foster care
because his mother refused to care for him. Id.

*Langston's Objections to the PSI and Subsequent Revisions*

In a filing dated February 6, 2023, Langston lodged a
number of objections to the PSI. App. 290-98. An addendum
to the revised PSI noted that the objections were "believed
to be resolved through alteration of the report." App. 286.
At the sentencing hearing, defense counsel agreed that the
revised PSI adequately addressed the objections. App. 171-
72.

*The Last-Minute Additions to The PSI*

In an email dated March 29, 2023, the Probation
Officer inserted several paragraphs related to an incident
at a casino. App. 288-89. Paragraph 9A described the
incident as follows:

> On March 19, 2023, Langston consumed alcohol at a
> casino in New Hampshire and ultimately became
> disruptive and aggressive after disagreeing with how
> an error in dealing was resolved by casino staff. He
> told staff, "Well, I'm getting my $200 back one way or
> another." He was ultimately detained by law
> enforcement and transported to a local jail to be held
> in protective custody until someone could pick him up.
> The officer and casino staff opined that Langston
> exhibited signs of intoxication. He failed to inform

his supervising officer of the law enforcement contact and he denied consuming any alcohol.

App. 289.

The Probation Officer further inserted a paragraph describing the submission of an affidavit in support of Langston. Paragraph 12A states:

> However, on March 28, 2023, the defendant tendered an affidavit marked defense exhibit 3 with the Court. The affidavit was from Jessica Witham who stated that she went to the casino with Langston on March 19, 2023 and observed him throughout the evening. She stated that neither she nor Langston consumed alcohol. Under the totality of the circumstances, it is believed that said affidavit contained false information (that he did not consume alcohol). Moreover, the inferred intent of the affidavit was to influence the Court's sentencing decision. Thus, the defendant obstructed justice.

App. 289.

In light of the events at the casino and the submission of Ms. Witham's affidavit, the Probation Officer opined that Langston had not accepted responsibility for his actions and was no longer entitled to an adjustment for acceptance of responsibility. Id. The Probation Officer further found that Langston had obstructed justice in connection with his putative effort to "influence the Court's sentencing decision." Id. The PSI therefore added two-levels "pursuant to U.S.S.G. § 3C1.1." Id.

The last-minute changes to the PSI resulted in an adjusted total offense level of 20; a total offense level

of 20; and a guideline sentencing range of 70-87 months.
Id.

*The Sentence*

The day after the Probation Officer dramatically revised the PSI to support a harsher sentence, a sentencing hearing was held. Langston, both individually and through counsel, stated that his initial objections to the draft PSI had been resolved. App. 171-72. He objected, however, to the introduction of exhibits that purported to document an incident at a casino on the night of March 19, 2023. App. 172-74. According to the Probation Officer, "Langston consumed alcohol at a casino in New Hampshire and ultimately became disruptive and aggressive after disagreeing with how an error in dealing was resolved by casino staff." App. 289. The police ultimately intervened and took Langston into protective custody. Id.

According to the Probation Officer, Langston violated the conditions of his pretrial release by consuming alcohol at the casino and failing to immediately notify the Probation Officer about his interaction with the police. App. 288. Langston's counsel argued that the Government had failed to prove that Langston was drinking alcoholic beverages, pointing to video showing that he was "[]steady on his feet," courteous to police officers and emphatic in

his request for a breathalyzer. App. 192. She also noted that he alerted the police to the fact that he was supervised by a federal probation officer.[5]

Judge Singal found that Langston was consuming alcoholic beverages, in violation of his conditions of pretrial release. The district judge stated:

> I've reviewed the video of him in the back of the cruiser, and there's no question in my mind that he was inebriated, absolutely no question he was inebriated. He acted so different than he has any other time. He was singing to himself, he was groggy, his voice sounded inebriated. And I also take into account there was absolutely no reason for the police officer to mistake inebriation in this case. They weren't arresting him for being drunk; in fact, they didn't arrest him at all. And whether or not he was asking for a breath test there's -- I can see why the police officers wouldn't do it because he wasn't being charged with anything. He was just being protected. So in my mind clearly to a preponderance he had been drinking and he was inebriated. And that's what I find.

App. 200.

Based on that finding, Judge Singal found that Langston had not accepted responsibility for his offense conduct. He explained:

> Let me start at the beginning here. The initial offense involved drinking at a bar, not cooperating with police, resisting the police.

***

---

[5] Langston further notes that he personally notified the Probation Officer of his interaction with the police on March 21, 2023. App. 206.

I find he was intoxicated at the casino. He was drinking in violation of his bail provisions. He was asked to leave multiple times and refused. I base this on the exhibits. The security guard, I note, felt he was drinking; the police smelled alcohol. When the police came he refused to give his full name multiple times, in spite of the fact that he was on probation and subject to bail conditions. Multiple times he gave his name as Carl, refused to give his name, acting like a -- he was toying with the police. When the police attempted to take him out, the police described him as aggressively jerking his arm. He continued to refuse to cooperate with the police, and I'm referring back again to the analogy to the earlier offense. He made comments to the casino manager, I believe it was the manager, saying I'm going to get my two dollars back -- $2200 back one way or another, which to me is a threat. And he didn't report this incident to the probation officer until March 21st. I understand that his position is that the policeman could have reported it, but that was not the -- the bail obligation. It was his obligation to report it, making light of his obligations.

I think coupled with the original offense, it appears to me he hasn't learned much. And I find there's no acceptance of responsibility.

App. 206.

Judge Singal accordingly denied Langston a three-level reduction for acceptance of responsibility. App. 206. He agreed with the Probation Officer that the base offense level was fourteen. App. 229. He further found that Langston "possessed the firearm during a felony offense, namely assault on an officer; therefore, four levels are added for a total offense level of 18." Id. In light of Langston's criminal history of VI, Judge Singal calculated an advisory guideline range of 57 to 71 months. Id. He

imposed a sentence at the bottom end of that range and a term of supervised release of three years. Add. 5.[6]

SUMMARY OF ARGUMENT

Langston pleaded guilty to a charge of unlawful possession of a firearm following an earlier conviction for theft by unauthorized taking or transfer. Since the statutory prohibition against possession of a firearm by a convicted thief is not "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms[,]" <u>N.Y. State Rifle & Pistol Ass'n v. Bruen</u>, 142 S. Ct. 2111, 2127 (2022), the conviction violates Langston's rights under the Second Amendment of the federal constitution. (Pages 20-24).

Officers seized a firearm from Langston's pocket during an investigatory detention. Since officers were investigating a tip reporting an unidentified citizen's possession of a concealed firearm, which is lawful in Maine, they had no reason to believe a crime was being committed. The investigatory stop was therefore unsupported by reasonable suspicion and the fruits of the unlawful seizure should have been suppressed. (Pages 24-31).

---

[6] Judge Singal heard argument on the obstruction of justice enhancement. Defense counsel argued that the Government had not met its burden of establishing the applicability of the enhancement. App. 185. Judge Singal did not, however, apply an obstruction of justice enhancement. App. 215.

In the PSI, the Probation Officer added four levels to Langston's offense level due to Langston's unlawful possession of a firearm during the commission of a felony assault on an officer. Since the officers on scene testified that Langston's only arrestable offense stemming from his interaction with the police was the misdemeanor of failure to submit to arrest or detention, the District Court's addition of the four-level increase was plain error. (Pages 31-37).

Judge Singal found that Langston had not accepted responsibility for the charged offense because he purportedly violated the conditions of his pretrial release. Since the putative violations were unrelated to the firearms offense, Judge Singal clearly erred by finding that the bail violations outweighed the powerful evidence of acceptance of responsibility represented by his guilty plea in open court. (Pages 37-42).

At Langston's sentencing hearing, the district court admitted, over objection, out-of-court statements purporting to establish a violation of his conditions of pretrial release. Since the challenged exhibits did not bear sufficient indicia of reliability to factor into his sentence, Judge Singal committed a serious procedural error that invalidates the resulting sentence. Since Langston's

sentence was the product of serious procedural error, his
sentence must be vacated. (Pages 42-50).

### ARGUMENT

#### I. THE DEFENDANT'S CONVICTION VIOLATES THE SECOND AMENDMENT OF THE FEDERAL CONSTITUTION.

Langston pleaded guilty to a charge of unlawful
possession of a firearm following earlier convictions for
felony theft and drug trafficking. Since the statutory
prohibition against possession of a firearm for prior
nonviolent offenses is not "part of the historical
tradition that delimits the outer bounds of the right to
keep and bear arms[,]" N.Y. State Rifle & Pistol Ass'n v.
Bruen, 142 S. Ct. 2111, 2127 (2022), the conviction
violates Langston's rights under the Second Amendment of
the federal constitution.

#### A. Standard of Review.

Langston's counsel did not challenge the
constitutionality of the felon-in-possession charge in the
district court. This Court therefore reviews Langston's
claim for plain error. United States v. Matos, 531 F.3d
121, 122 (1st Cir. 2008). To show plain error, Langston
must demonstrate that the enhancement represented (1) "an
error . . . (2) which was clear or obvious and which not
only (3) affected [his] substantial rights, but also (4)

seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Pennue, 770 F.3d 985, 989 (1st Cir. 2014). A conviction of an offense not authorized by Congress constitutes plain error. United States v. Tann, 577 F.3d 533, 539-40 (3d Cir. 2009). Cf. United States v. Nichols, 897 F.3d 729, 733-34 (6th Cir. 2018) (finding plain error where court imposed a sentence in excess of statutory maximum in light of Supreme Court's subsequent ruling that ACCA residual clause was unconstitutional).

B. Since The Felon-in-Possession Statute Violates the Second Amendment As Applied to Langston, The District Court's Judgment Must Be Vacated.

The Supreme Court's decision in Bruen renders unconstitutional federal laws prohibiting defendants from possession of a firearm due to prior convictions for nonviolent offenses. Range v. Attorney Gen. United States, 69 F.4th 96 (3d Cir. 2023)0(en banc). Since the Defendant was labeled a felon due to his prior convictions for the charges of drug trafficking and theft by unauthorized taking or transfer, his conviction cannot stand.

In Bruen, supra, the Supreme Court announced a new framework for analyzing restrictions on the possession of firearms under the Second Amendment. The new approach anchors itself exclusively in the Second Amendment's text

and the pertinent history of firearms regulation, with the government bearing the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127. Thus, in the absence of comparable regulations "'immediately after [the Second Amendment's] ratification through the end of the 19th century,'" id. at 605, the Government cannot meet its burden of establishing that a firearm regulation survives constitutional scrutiny.

In Range, supra, the court of appeals considered the impact of Bruen on laws prohibiting the possession of a firearm by a felon convicted of a nonviolent offense. In its view, the prohibition against possession of a firearm by an individual due to a prior conviction is not "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 142 S. Ct. at 2127.

Although federal law has prohibited the possession of a firearm by those convicted of certain offenses as far back as 1938, the earliest version of the "federal felony firearm ban ... initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and

misdemeanants convicted of qualifying offenses." <u>United States v. Booker</u>, 644 F.3d 12, 24 (1st Cir. 2011).

As the Third Circuit explained in <u>Range</u>, the <u>Bruen</u> Court's emphasis on "Founding- and Reconstruction-era sources," makes it a "dubious proposition" that the 1938 Act was "longstanding" enough to comport with the Second Amendment. <u>Range</u>, <u>supra</u> at 17, citing 142 S.Ct. at 2136, 2150. Even if it were sufficiently longstanding to satisfy the <u>Bruen</u> test, however, Langston's prior offenses for theft and drug trafficking would not have disqualified him from gun ownership under the first federal felony firearm ban. Under Maine law, "[a] person is guilty of theft if: [...] The person obtains or exercises unauthorized control over the property of another with intent to deprive the other person of the property." Me. Rev. Stat. Tit. 17-A § 353(1)(A). As a nonviolent offense, a conviction for theft cannot be the basis of a ban on possessing firearms.

Likewise, drug trafficking does not meet the historical test set forth in <u>Bruen</u>. As far back as 2011, this Court observed that "the Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban." <u>United States v. Torres-Rosario</u>, 658 F.3d 110, 113 (2011). It therefore "assum[ed] arguendo that the Supreme

Court might find some felonies so tame and technical as to be insufficient to justify [§ 922(g)(1)'s] ban" but concluded that drug dealing, for which the defendant had been convicted, was "not likely to be among them." Id.

Langston respectfully submits that this Court underestimated the Supreme Court's skepticism towards gun regulation. As the three dissenting justices noted in Bruen, the majority's "rigid history-only approach" marked a novel framework that had never been adopted by a court of appeals. See Bruen, 142 S. Ct. at 2125-26. The Supreme Court's reasoning suggests that a bar on gun possession due to a prior conviction would be the exception, not the rule, and would be limited to violent offenders.

Langston is currently serving a sentence for violating a statute that clashes with the Supreme Court's understanding of the Second Amendment. His conviction cannot stand.

> II. The District Court Erred In Denying The Defendant's Motion to Suppress, Because The Portland Police Did Not Have Reasonable Suspicion To Detain Him. The Fruits of the Unlawful Seizures Should Have Been Suppressed.

Officers seized a firearm from Langston's pocket during an investigatory detention prompted by two callers. Since the investigatory stop was not supported by reasonable suspicion, see Terry v. Ohio, 392 U.S. 1, 27,

(1968), the fruits of the unlawful seizure should have been suppressed. <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963). The motion judge's denial of Langston's motion to suppress must be vacated.

A.    Standard of Review.

When reviewing a district court's denial of a motion to suppress, this Court assesses factual findings for clear error and evaluates legal issues de novo. <u>United States v. Harrington</u>, 56 F.4th 195, 200 (1st Cir. 2022), citing <u>United States v. Tiru-Plaza</u>, 766 F.3d 111, 114–15 (1st Cir. 2014). "In assessing these legal conclusions, however, we also give appropriate weight to the inferences drawn by the district court and the on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the witnesses and events." <u>Harrington</u>, 56 F.4th at 200 (internal quotations omitted). This Court "will uphold a denial of a motion to suppress 'provided that any reasonable view of the evidence supports the decision.'" <u>Harrington</u>, 56 F.4th at 200, quoting <u>United States v. Ferreras</u>, 192 F.3d 5, 10 (1st Cir. 1999).

B.    Officers Lacked Reasonable Suspicion To Believe
      That Langston Was Committing A Crime When They
      Tackled Him, Because They Acted On A Tip That Not
      Only Consisted Of Hearsay But Also Failed To
      Allege A Crime.

The Fourth Amendment to the federal constitution grants individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const., amend IV.* Police officers may stop, and briefly detain, an individual if they have a reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). Reasonable suspicion includes both a particularized and objective basis for the suspicion, *i.e.,* the finding must be "grounded in specific and articulable facts" and the circumstances must be viewed through the lens of a reasonable police officer. United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Hensley, 469 U.S. 221, 229 (1985); United States v. Ponotoo, 666 F.3d. 20, 28 (1st Cir. 2011).

In analyzing whether reasonable suspicion exists, the motion judge must look to the totality of the circumstances. Cortez, 449 U.S. at 417. "Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence but still requires at least a minimal level

of objective justification for making the stop." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000).

Although police officers may rely on information provided by informants to establish reasonable suspicion, the information must have sufficient indicia of reliability and an informant's veracity, reliability, and basis of knowledge should be assessed. <u>Alabama v. White</u>, 496 U.S. 325, 328-29 (1990). An anonymous tip that a person is carrying a gun, without more, is insufficient to justify a police officer's stop and frisk of that person. <u>Florida v. J.L.</u>, 529 U.S. 266, 268 (2000). A tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." <u>Id</u>. at 272.

Notwithstanding its recognition that firearms are dangerous and may pose a serious threat to public safety, the United States Supreme Court has refused to adopt an automatic "firearm exception" under the <u>Terry</u> analysis. <u>Id</u>. When "the police receive an anonymous tip alleging a subject's possession or use of a firearm, the police must typically 'see[] something that confirm[s] the presence of a gun' – which is to say, something that corroborates the tip that there was a gun – before stopping the subject." <u>Miles v. United States</u>, 181 A.3d 633, 638 (D.C. Ct. App. 2018). "The reasonableness of official suspicion must be

measured by what the officers knew before they conducted their search." <u>Fla. v. J.L.</u>, 529 U.S. at 271.

In this case, Portland police officers visited The Bar twice. Add. 15-16. During their first visit after the initial 911 call about a fight between a black male and a white male, officers observed no disturbances. Add. 15. They conferred with the club's security guard who "confirmed that there was an altercation but believed that a recurrence was unlikely unless the participants encountered each other somewhere else that night." <u>Id</u>. The bar's security guard did not "provide[] an in-depth description of the combatants." <u>Id</u>. Portland Police made no further effort to identify the combatants or investigate the neighbor's allegation that a fight had occurred. <u>Id</u>. The investigation was completed when Officer Rogers "radioed dispatch that everything was calm at The Bar and there was no sign of a disturbance." <u>Id</u>.

A short time later, however, officers received information from dispatch that a black male involved in the fight allegedly went to his car to get a gun. Add. 16. Officers were told that this information was "third-hand." <u>Id</u>. They returned to the scene, spotted an individual matching the description of one of the earlier combatants,

and detained him. Id. During the stop, they found and seized a firearm from his sweatshirt pocket. Id.

The totality of the circumstances did not give rise to a reasonable suspicion that Langston was involved in criminal activity when police encountered him. The information that prompted officers to return to the scene consisted of two calls that, together, alleged that a bar patron was carrying a concealed firearm. Add. 15-16. A neighbor called to report that the person he had complained about earlier was "still in the bar" the bar but made no reference to a gun. Add. 15. The bar manager in turn called with "third-hand" information that a patron had a gun. Add. 16.

Neither these calls nor officers' observations at the scene granted the police the constitutional authority to conduct a Terry stop. The neighbor's call purporting to identify one of the individuals involved in an earlier fight did not support an investigatory detention, because officers were not investigating the scuffle that had prompted the neighbor's first call. On the contrary, their observations at the scene and their discussion with the bar security guard had satisfied them that no further investigation was warranted. Add. 15. Notably, there is no indication in the record that the police sought to

ascertain the identity or whereabouts of the other combatant. When officers returned to the scene, it was to investigate whether a particular black, male patron had a gun.

Moreover, the bar manager's report that a patron had a concealed firearm could not support a reasonable suspicion justifying an investigatory detention. By his own admission, he did not have first-hand knowledge of the information contained in the report. Indeed, he was not even at the bar when he called to pass along "third-hand" information that a patron had a concealed handgun. Add. 16. This Court made clear that a "hearsay tip" alone did not furnish the police with a constitutional basis to detain an individual for investigatory purposes. United States v. Monteiro, 447 F.3d 39, 46 (1st Cir. 2006).

More fundamental still, the bar manager did not allege that criminal activity was afoot. Under Maine law, an individual old enough to enter a bar does not need a permit to carry a concealed firearm. See Me. Rev. Stat. Tit. 25 § 2001-A(2)(A-1). Thus, a report that an unidentified bar patron may possess a concealed handgun does not support a suspicion of criminal activity, reasonable or otherwise, because carrying a concealed handgun is no crime at all.

At the time of their seizure of Langston, officers were investigating a "third-hand" report that he had a concealed firearm. Since neither the reports nor their observations supported a reasonable suspicion that Langston was involved in criminal activity, the evidence seized during the unlawful detention should have been suppressed. Wong Sun v. United States, 371 U.S. 471, 484 (1963).

> III. THE DISTRICT COURT PLAINLY ERRED BY ADDING A FOUR-LEVEL ENHANCEMENT TO LANGSTON'S OFFENSE LEVEL FOR POSSESSION OF A FIREARM WHILE COMMITTING A FELONY, WHEN THE ARRESTING OFFICERS TESTIFIED THAT HIS ONLY CRIME WAS THE MISDEMEANOR OF FAILING TO SUBMIT TO DETENTION.

In the PSI, the Probation Officer added four levels to Langston's offense level due to Langston's unlawful possession of a firearm "during felony Assault on an Officer." See App. 262, citing U.S.S.G. § 2K2.1(b)(6)(A). Since the officers on scene testified that Langston's only arrestable offense stemming from his interaction with the police was "failure to submit to arrest or detention," see Add. 19, the District Court's application of the four-level increase was plain error.

> A. Standard of Review.

"A sentencing court is entitled to rely on circumstantial evidence, and draw plausible inferences therefrom" in determining whether an enhancement should

apply. <u>United States v. Cannon</u>, 589 F.3d 514, 517 (1st Cir.

2009). Since Langston did not object to the imposition of

the sentencing enhancement, this Court reviews his claim

for "plain error." <u>United States v. MacArthur</u>, 805 F.3d

385, 390 (1st Cir. 2015). To show plain error, Langston

must demonstrate that the enhancement represented (1) "an

error . . . (2) which was clear or obvious and which not

only (3) affected [his] substantial rights, but also (4)

seriously impaired the fairness, integrity, or public

reputation of judicial proceedings." <u>United States v.</u>

<u>Pennue</u>, 770 F.3d 985, 989 (1st Cir. 2014).

> B. The District Judge's Finding That Langston
>    Unlawfully Possessed a Firearm While Committing a
>    Felony Is Plainly Erroneous.

Pursuant to U.S.S.G. § 2K2.1(b)(6), a defendant is

subject to a four-level increase in his base offense

calculation if he "used or possessed any firearm or

ammunition in connection with another felony offense; or

possessed ... any firearm ... with knowledge, intent, or

reason to believe that it would be used or possessed in

connection with another felony offense." <u>Cannon</u>, 589 F.3d

at 517. Here, the district judge found, without objection,

that Langston was committing the crime of "felony Assault

on an Officer" while possessing a firearm. App. 229, 262.

Although the offense of assault on an officer is indeed a felony under Maine law, see Me. Rev. Stat. Tit. 17-A § 752-A(1)(A), Officer Rogers witnessed and videoed the entire exchange between Langston, Officer Theriault and himself. At the hearing on Langston's motion to suppress, Officer Rogers testified that Langston was arrested for the charge of "[r]efusal to submit to arrest or detention." App. 56. Asked whether Langston had committed any other arrestable offense, Officer Rogers acknowledged: "At that point, we did not have anything else, no, just because we did not know who he was." Id.[7]

Furthermore, he acknowledged on cross-examination that the putative victim, Officer Theriault, came up from behind Langston while Langston was looking at Officer Rogers. App. 72. Officer Rogers admitted that Langston "did not see" Officer Theriault before Langston made contact with the latter officer. Id.

Officer Theriault's own testimony likewise describes a refusal to submit, but not an assault on an officer. Under Me. Rev. Stat. Tit. 17-A § 752-A(1)(A), "A person is guilty

---

[7] Refusal to submit is a misdemeanor under Maine law, carrying a maximum term of incarceration of 364 days. See Me. Rev. Stat. Tit. 17-A § 751(B)(1) (violation of the statute is a Class D or Class E crime). See also Me. Rev. Stat. Tit. 17-A §§ 1252(2)(D) & 1301(1-A), (D) (imprisonment up to 364 days and fine of up to $1000 for Class D crimes).

of assault on an officer if: (A) He intentionally, knowingly or recklessly causes bodily injury to a law enforcement officer while the officer is in the performance of his official duties." Id. The Maine Supreme Court has concluded that the prosecution bears the burden of establishing that the defendant knew that the victim was an officer. State v. Morey, 427 A.2d 479, 483 (Me. 1981) ("[W]e cannot see how imposing liability for assault on a [law enforcement officer] without also requiring knowledge of his identity could further the specific deterrent purpose expressed by the statute.")

Officer Theriault described an incident where he approached Langston from behind while Officer Rogers issued commands to Langston. "Langston turned and faced Officer Rogers [and then] started back-pedalling." App. 82. According to Officer Theriault, "I am very confident that [Langston] had no idea I was behind him." Id.

At that point, Officer Theriault "grabbed on to his right wrist and the back of his right arm." Id. Confronted with Officer Rogers's conflicting orders and Officer Theriault's stealthy seizure from behind, Langston "immediately tried to pull away." App. 83. Officer Theriault lost control of Langston's arm "so [he] wrapped [his] arm around [Langston's head] and the back of his shoulders and pulled him to the ground." Id. Officer Theriault testified that Langston "was

actively physically resisting us, pulling his hands away, trying to put his hands in front of him." Id. By Officer Theriault's own account, Langston sought to avoid contact with the police rather than engage the officers.

Finally, to the extent that Officer Theriault suffered a minor abrasion to the knee during the seizure, he admitted that it resulted from his own deliberate actions. He testified that he "purposefully dropped to the ground" shortly after grabbing Langston. App. 108-09. He denied that Langston pushed him down to the ground.  App. 109.

The sentencing judge's finding that Langston possessed a firearm while committing the felony of assault on an officer is a clear and obvious error. See, e.g., United States v. Romero, 896 F.3d 90 (1st Cir. 2018) (erroneous application of the plain error standard was plain error).  First, the officer who observed the entire exchange between Officer Theriault and Langston concluded that he had refused to submit to detention, not that he had assaulted an officer. Second, the putative victim acknowledged that he snuck up behind Langston and grabbed him before tackling him. Officer Theriault's surreptitious initiation of a physical seizure from behind does not convert Langston's actions into an assault on a law enforcement officer. Finally, Officer Theriault's description of Langston's actions makes out a textbook example of refusing

to submit. Langston sought to disengage from officers, not to assault them, and in a manner expressly encompassed by Maine's refusal to submit statute. <u>See</u> Me. Rev. Stat. Tit. 17-A § 751-B(1) (refusal to submit includes the "use physical force against the law enforcement officer" who attempts to detain him).

The obvious misapplication of the enhancement affected Langston's "substantial rights." <u>Romero</u>, 896 F.3d at 92, quoting <u>United States v. Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001). As in <u>Romero</u>, the enhancement yielded an inaccurately inflated Guidelines sentencing range. The four-level enhancement resulted in a Guidelines sentencing range of 57-71 months. Had the enhancement been properly omitted, Langston would have been subject to a Guidelines sentencing range of 37-46 months.

In <u>Rosales-Mireles v. United States</u>, 138 S. Ct. 1897 (2018), the Supreme Court held that "[i]n the ordinary case, as here, the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." <u>Id</u>. at 1911. This Court applied that principle in <u>Romero</u>, noting that both <u>Rosales-Mireles</u> and <u>Romero</u> "involved an error in a presentence report, unnoticed by the parties and the district court, that inflated the Guidelines range of a

defendant[.]" <u>Romero</u>, 896 F.3d at 92, citing <u>Rosales-Mireles</u>, 138 S. Ct. at 1911.

As in <u>Romero</u>, the incorrect imposition of the sentencing enhancement amounts to plain error because it involved an error that artificially inflated Langston's Guidelines sentencing range. Langston is therefore entitled to resentencing.

> IV.    THE DISTRICT COURT ABUSED ITS DISCRETION BY FINDING THAT LANGSTON HAD NOT ACCEPTED RESPONSIBILITY FOR HIS OFFENSE CONDUCT.

Judge Singal clearly erred in finding that Langston had not accepted responsibility for the charged offense because he purportedly violated the conditions of his pretrial release. App. 206. Without the three-level reduction initially recommended by the Probation Officer (App. 262), Langston's advisory Guidelines sentencing range therefore jumped from 41-51 months to 57-71 months. U.S.S.G. Ch. 5, Pt. A.  Since the district court erroneously denied Langston credit for accepting responsibility, Langston is entitled to resentencing.

> A. Standard of Review.

A "sentencing court's factbound determination that a defendant has not accepted responsibility" is reviewed only for clear error. <u>United States v. McCarthy</u>, 32 F.4th 59, 62-63 (1st Cir. 2022). <u>See also</u> <u>United States v. McLaughlin</u>, 378 F.3d 35, 37 (1st Cir. 2004). This Court

"will not reverse unless — after a careful review of all the relevant facts — we are 'left with a definite and firm conviction that a mistake has been committed.'" McCarthy, 32 F.4th at 63, quoting Brown v. Plata, 563 U.S. 493, 513, (2011). "Despite this deference, though, questions of law, including questions involving the interpretation of the sentencing guidelines, engender de novo review." Id.

    B. The District Court Clearly Erred By Concluding
       That Langston Did Not Accept Responsibility For
       His Offense Conduct.

The revised PSI dated February 9, 2023, recommended a three-level adjustment due to Langston's acceptance of responsibility for his offense. App. 206. The Probation Officer withdrew her recommendation following an incident at a New Hampshire casino on the night of March 19 and 20, 2023. App. 288-89. The sentencing judge agreed that Langston violated the conditions of pretrial release during the incident and denied him an adjustment for acceptance of responsibility. App. 206. This was clear error.

The United States Sentencing Guidelines provide for a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," U.S.S.G. § 3E1.1(a), and an additional one-level reduction, on the government's motion, if — among other requirements — the defendant has "timely notif[ied] authorities of his

intention to enter a plea of guilty," id. § 3E1.1(b). See
McCarthy, 32 F.4th at 63.

The Sentencing Commission has provided a non-exclusive
list of factors relevant to a sentencing court's
determination whether a defendant has accepted
responsibility for the offense of conviction. See U.S.S.G.
§ 3E1.1, cmt. n.1. For instance, "a sentencing court may
appropriately consider whether [the defendant] has
voluntarily ceased all participation in criminal activity."
McLaughlin, 378 F.3d at 38, citing U.S.S.G. § 3E1.1,
comment n.1(b).

In McLaughlin, this Court made clear that the district
court could properly consider the defendant's conduct while
on pretrial release in assessing whether he accepted
responsibility for his offense. McLaughlin, 378 F.3d at 41.
In that case, however, the defendant continued to commit
crimes after his indictment. Id. Indeed, he did not dispute
that "while on pretrial release, [he] drove under the
influence of alcohol and possessed heroin." Id. The court
therefore held that the district court could properly deny
acceptance of responsibility credit under the commentary to
U.S.S.G. § 3K1.1. Id.

In this case, by contrast, the sentencing judge
explicitly found that Langston was not engaged in criminal

activity during the incident at the casino. He noted that police officers in New Hampshire "weren't arresting [Langston] for being drunk; in fact, they didn't arrest him at all." App. 200.[8]

In McLaughlin, this Court accepted the general principle that "'a defendant's failure to comply with conditions of a bond [can] be highly relevant to assessing the sincerity of the defendant's contrition.'" Id., quoting United States v. Hooten, 942 F.2d 878, 883 (5th Cir. 1991). In Hooten, however, the defendant "failed to reside at the location specified in his bond, did not comply with curfew restrictions, and did not report to pretrial services as required under the conditions of his bond." Id. at 883 n.11. That is, the defendant breached the core conditions

---

[8] Paradoxically, Judge Singal used the fact that Langston was not charged with public intoxication or a similar offense as a basis to discredit the best evidence that Langston was sober. During his interactions with the police, Langston pleaded with officers to administer a Breathalyzer. Judge Singal observed: "And whether or not he was asking for a breath test there's -- I can see why the police officers wouldn't do it because he wasn't being charged with anything." App. 200. Thus, Judge Singal relied on the fact that Langston was not suspected of alcohol-related criminal activity as evidence that Langston consumed alcohol in violation of his conditions of pretrial release. Judge Singal's strained reasoning further shows that the purported violation was too trivial to deny Langston an adjustment for acceptance-of-responsibility.

of his pretrial release such that pretrial services could not meaningfully monitor him.

In this case, the sentencing judge found that Langston violated the terms of his release by consuming alcohol and causing a disturbance. Unlike <u>Hooten</u>, Langston's putative violation was isolated and technical in nature. It did not negate the Probation Officer's ability to monitor him. He informed the New Hampshire police that he was on federal probation and beseeched officers to administer a Breathalyzer.

Even conceding that a defendant's violation of a condition of release may factor into the acceptance-of-responsibility calculus, Langston's alleged violation did not outweigh the "impressive evidence of acceptance of responsibility" represented by his guilty plea in open court. <u>McLaughlin</u>, 378 F.3d at 39. The sentencing judge nonetheless punished Langston for a single violation during nearly two years of pretrial release.[9] Moreover, the violation did not involve conduct associated with the firearms offense that he accepted responsibility for.

---

[9] The PSI noted that Langston was involved in a verbal dispute at a bar in May of 2022. App. 288. The Probation Officer apparently credited his female companion's account that she consumed the alcoholic beverages that he bought. <u>Id</u>.

Under the circumstances, the district court clearly erred in finding that Langston did not accept responsibility for unlawfully possessing a firearm. Since the erroneous finding yielded a substantially higher Guidelines sentencing range, this Court should vacate Langston's sentence and remand for resentencing.

V.   THE DISTRICT COURT COMMITTED A SERIOUS PROCEDURAL ERROR BY ADMITTING, OVER OBJECTION, HEARSAY EVIDENCE TO SUPPORT ITS FINDING THAT THE DEFENDANT VIOLATED THE CONDITIONS OF PRETRIAL RELEASE.

At Langston's sentencing hearing, the district court overruled his objection to the admission of out-of-court statements purporting to document a violation of Langston's conditions of pretrial release. App. 172-174. That finding resulted in a miscalculated Guidelines sentencing range. See Section IV, supra. Since Langston's sentence was the product of serious procedural error, his sentence must be vacated.

A. Standard of Review.

This Court "review[s] preserved challenges to the district court's application of Sentencing Guidelines enhancements for abuse of discretion." United States v. Iwuanyanwu, 69 F.4th 17, 21 (1st Cir. 2023). Appellate "review . . . consists of 'clear error review [of] factual findings, de novo review [of] interpretations and

applications of the [G]uidelines, and abuse of discretion review [of] judgment calls.'" United States v. Kitts, 27 F.4th 777, 789 (1st Cir. 2022) (alterations in original), quoting United States v. O'Brien, 870 F.3d 11, 15 (1st Cir. 2017).

> B. The District Court Erroneously Relied Upon Untrustworthy Hearsay Evidence To Support A Key Finding Of Fact On A Disputed Issue At Sentencing.

At sentencing, the Government introduced, over objection, (1) the protective custody report from an incident at a casino in Seabrook, New Hampshire; (2) an email from a casino employee alleging that Langston had consumed nine alcoholic beverages over a seven-hour period; and (3) an email from the director of casino operations reporting statements apparently made by other employees to casino investigators. App. 172-74, 236-251. Since each exhibit amounted to unreliable hearsay, Judge Singal erred by admitting them. He aggravated the error by relying heavily on the statements to find Langston unworthy of credit for acceptance-of-responsibility.

"[T]he sentencing court has broad discretion to accept hearsay evidence at sentencing so long as the court supportably concludes that the information has sufficient indicia of trustworthiness to warrant a finding of probable

accuracy." <u>United States v. Acevedo-López</u>, 873 F.3d 330,
340 (1st Cir. 2017), quoting <u>United States v. Rodríguez</u>,
336 F.3d 67, 71 (1st Cir. 2003). Indicia of trustworthiness
can include corroboration by other evidence. <u>Acevedo-López</u>,
873 F.3d at 340, citing <u>United States v. Ramírez-Negrón</u>,
751 F.3d 42, 52 (1st Cir. 2014) ("[T]he hearsay testimony
was corroborated by ... [the agent's] personal knowledge
and observation of the videos."). The government must only
produce corroborative evidence of hearsay where a defendant
makes "a specific denial ... of the truth of the
statements." <u>United States v. Tracey</u>, 675 F.2d 433, 441
(1st Cir. 1982).

In this case, Judge Singal overruled the objections on
the ground that the documents had "sufficient indicia of
reliability to support [their] probable accuracy." App.
173. Judge Singal's conclusion cannot stand.

1. Exhibit 1: The Protective Custody Report

As defense counsel pointed out at the sentencing
hearing, the hearsay statements contradict themselves.
While the police report conveyed the casino manager's
assertion that a disputed poker hand "had been dealt
correctly," Exhibit 5 -- a report from the casino --
acknowledged that the dealer had made a mistake. App. 172-
73.

Moreover, the police report depicts a patent misuse of the New Hampshire protective custody to punish Langston for asserting his rights.[10] While New Hampshire law allows law enforcement to take an "intoxicated" individual into protective custody, N.H. Rev. Stat. Ch. 172-B:3(I), the reporting officer's finding of intoxication rested primarily on his observation that he "could smell the alcohol coming from his person." App. 238. Neither Officer Kines nor any other witness described any other indicia of intoxication. App. 236-241. See Gutierrez v. Kermon, 722 F.3d 1003, 1012 (7th Cir. 2013) (common indicia of intoxication include "impaired attention and reflexes," "unsteady balance," and "slurred speech"). The officer's unwillingness to administer a Breathalyzer test further

---

[10] N.H. Rev. Stat. ch. 172-B:3(I) provides, in part:

I. When a peace officer encounters a person who, in the judgment of the officer, is intoxicated as defined in [N.H. Rev. Stat. ch.] 172-B:1(X), the officer may take such person into protective custody and shall take whichever of the following actions is, in the judgment of the officer, the most appropriate to ensure the safety and welfare of the public, the individual, or both:

(a) Assist the person, if he consents, to his home, an approved alcohol treatment program, or some other appropriate location; or
(b) Release the person to some other person assuming responsibility for the intoxicated person; or
(c) Lodge the person in a local jail or county correctional facility for said person's protection, for up to 24 hours or until the keeper of said jail or facility judges the person to be no longer intoxicated.

detracts from his conclusory statement that Langston was intoxicated. Cf. Muir v. Danner, 479 F.Supp.3d 683, 693-94 (M.D. Tenn. 2020) ("[T]he fact that the driver had no alcohol in his blood 'casts doubt' on the officer's claim that the driver 'smelled of alcohol and failed the field sobriety tests.'"), quoting Miller v. Sanilac Cnty., 606 F.3d 240, 248-49 (6th Cir. 2010).

Judge Singal erred in finding that the police report was sufficiently reliable to consider at Langston's sentencing hearing. On the contrary, the report was singularly unreliable because it failed altogether to establish that Langston qualified for protective custody. Officer Kines effectively admitted that he used the protective custody statute to short-circuit Langston's "argu[ment] about the arrest and his rights etc." App. 240. The Seabrook Police's patent bad faith in its handling of the situation negated any reliability conceivably attributable to the police report.

2. Exhibits 4 and 7: Internal Emails Between Casino Employees.

Over objection, Judge Singal admitted two emails purporting to establish that Langston had 9 alcoholic beverages "between 10:34 AM to the time he left at 11:20 PM." App. 246. One email, Exhibit 4, attached photos of

Langston being served unidentified beverages in the poker room. App. 246-48.

Judge Singal once again erred in admitting the out-of-court statements, because they did not bear sufficient indicia of reliability. As defense counsel noted, the authors of the emails "attest[] without any personal knowledge that Mr. Langston consumed alcoholic beverages at the casino." App. 174.

Although the images attached to Exhibit 4 clearly show Langston being served beverages, the two exhibits combined do not contain any statements by an individual with personal knowledge of the contents. By all appearances, the author of Exhibit 7 simply identified the server and the time of service from surveillance videos. Thus, even casino security did not ask the three identified servers – Caitlin Cunningham, "Victoria" and "Joe Joe" – what Langston was drinking. App. 251. The exhibits merely state that the beverages were unidentified alcoholic drinks. Id.

Exhibits 4 and 7 bear no indicia of reliability, at least to the extent they purport to classify Langston's beverages as alcoholic. Indeed, crediting the latter assertion requires a logical backflip. That is, Judge Singal's admission of the hearsay required him to credit employees of Eureka Casino, even though their statements,

taken as a whole, would require a finding that Eureka illegally served an intoxicated patron. See In re Baldoumas Enters., Inc., 149 N.H. 736, 829 A.2d 1056 (N.H. 2003) (affirming a finding that a New Hampshire bar "serv[ed] alcohol to an intoxicated person in violation of RSA 179:5"). Since the challenged exhibits' internal inconsistencies and totem pole hearsay negate their reliability, it was error to overrule Langston's objection at the sentencing hearing.

> 3. The District Court's Heavy Reliance On Inadmissible Hearsay Constitutes A Serious Procedural Error. Langston's Sentence Should Be Vacated.

Judge Singal erred in admitting the out-of-court statements at sentencing, particularly where they bore on a key fact impacting the calculation of Langston's Guidelines sentencing range. The procedural error requires resentencing.

The magnitude of the error stems from Judge Singal's flawed premise; namely, the incident at the casino closely mirrored the offense conduct. Yet his findings of fact about the casino incident derive almost entirely from the challenged exhibits – or, in some instances, a misreading of the exhibits. The following lists the key findings of fact and their evidentiary source.

- Langston was "intoxicated at the casino." App. 205 (Exs. 1, 4, 7).

- "He was drinking in violation of his bail provisions." Id. (Exs. 1, 4, 7).

- "He was asked to leave multiple times and refused." Id. (Exs. 1, 4).

- "The security guard felt he was drinking; the police smelled alcohol." Id. (Ex. 1).

- "When the police came he refused to give his full name multiple times, in spite of the fact that he was on probation and subject to bail conditions." Id. (Ex. 1).

- "Multiple times he gave his name as Carl, refused to give his name, acting like a -- he was toying with the police." Id. (Ex. 1).

- "When the police attempted to take him out, the police described him as aggressively jerking his arm." Id. This finding is unsupported. Exhibit 1 states: "I told [Langston] I was placing him into protective custody and placed him in handcuffs behind his back without incident." App. 239.[11]

Judge Singal anchored his finding that Langston failed to accept responsibility in the unreliable hearsay offered up by the Government. Indeed, he expressly drew an "analogy to the earlier offense" in finding that Langston "hasn't learned much" and had not accepted responsibility for the charged offense conduct. App. 205, 206. Since his findings

---

[11] Sentencing exhibit 10, a surveillance video of the incident, likewise provides no support for the finding that Langston "jerk[ed] his arm" away from the officers.

of fact rested on the unreliable exhibits that he erroneously admitted, Langston is entitled to resentencing.

CONCLUSION

For the forgoing reasons, Langston respectfully requests that this Court vacate the judgment of the district court.

CARL LANGSTON
By His Attorney,

/s/ Robert Herrick
ROBERT HERRICK, ESQUIRE
Attorney for Carl Langston
PO Box 400143
Cambridge, Massachusetts 02140
Tel: (857) 331-0847
Email: rherricklaw@gmail.com
Bar No. 119803

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

    I, Robert Herrick, counsel for appellant Carl Langston, certify that the forgoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), and that, according to the word processing system used to prepare the brief, it contains 11,229 words.

                      /s/ Robert Herrick
                      ROBERT HERRICK


CERTIFICATE OF SERVICE

    I hereby certify that on November 29, 2023, I electronically filed the Appellant's Brief and Addendum using the CM/ECF system which will send notification of such filing to Assistant United States Attorney Benjamin M. Block.

                      /s/ Robert Herrick
                      ROBERT HERRICK

# ADDENDUM
# TABLE OF CONTENTS

Notice of Appeal..........................................1

Judgment (without Statement of Reasons)...................3

Indictment...............................................10

Conditional Plea.........................................12

Ruling on Defendant's Motion to Suppress.................14

136**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 2:21-cr-166-GZS** |
| | ) | |
| **CARL LANGSTON** | ) | |

## NOTICE OF APPEAL

Notice is hereby given that **CARL LANGSTON**, Defendant in the above-captioned matter, hereby appeals to the United States Court of Appeals for the First Circuit based on a conditional plea filed on November 21, 2022. (ECF # 80). The conditional plea was in reference to the trial court's Order denying suppression entered in this matter on June 29, 2022. (ECF # 61).

Mr. Langston appeals from the judgment and sentence entered in this matter on March 30, 2023. (ECF # 100).

Dated: April 6, 2023

/s/ Heather Gonzales, Esq.
Attorney for Defendant
Assistant Federal Public Defender
P.O. Box 595
Portland, Me 04112-0595
207-553-7070
FAX: 553-7017
Heather_Gonzales@fd.org

1

**Add. 1**

2
**CERTIFICATE OF SERVICE**


I, Heather Gonzales, hereby certify that I have this date caused the within Notice of Appeal to be served upon Assistant United States Attorney Johnathan Nathans, Esq., by forwarding a copy to him via the Court's ECF System: johnathan.nathans@usdoj.gov.


Dated: April 6, 2023                                             /s/ Heather Gonzales
                                                                Counsel for the Defendant

# United States District Court
## District of Maine

UNITED STATES OF AMERICA

v.

CARL LANGSTON

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 2:21-cr-166-GZS
USM Number: 50444509

Heather L. Gonzales, Esq.
_____
Defendant's Attorney

## THE DEFENDANT:

☒ pleaded guilty to count(s) <u>One of the Indictment</u>
☐ pleaded nolo contendere to count(s) _____ which was accepted by the court.
☐ was found guilty on count(s) _____ after a plea of not guilty.

**The defendant is adjudicated guilty of these offenses:**

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.SC. § 922(g)(1), 18 U.S.C. § 924(a)(2) | Felon in Possession of Firearm | February 7, 2021 | One |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____.
☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of material changes in economic circumstances.

03/30/2023
_____
Date of Imposition of Judgment

_____
Signature of Judge

George Z. Singal, U.S. District Judge
_____
Name and Title of Judge

3/30/23
_____
Date Signed

**Add. 3**

AO 245B   (Rev. 09/19) Judgment in a Criminal Case
Sheet 2 – Imprisonment

| | | Judgment—Page   2   of   7 |
|---|---|---|

DEFENDANT:           CARL LANGSTON
CASE NUMBER:      2:21-cr-166-GZS

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of <u>57 months.</u>

☐   The court makes the following recommendations to the Bureau of Prisons:

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:
     ☐           at _____ ☐ a.m. ☐ p.m. on _____.
     ☐           as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons.
     ☐           before 2 p.m. on _____.
     ☐           as notified by the United States Marshal.
     ☐           as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

a _____ ,   with a certified copy of this judgment.


_____

                                                    UNITED STATES MARSHAL


                               By _____
                                                    DEPUTY UNITED STATES MARSHAL

**Add. 4**

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
    Sheet 3 – Supervised Release

| | | Judgment—Page | 3 | of | 7 |
|---|---|---|---|---|---|

DEFENDANT:       CARL LANGSTON
CASE NUMBER:   2:21-cr-166-GZS

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of <u>three years.</u>

## MANDATORY CONDITIONS

1.     You must not commit another federal, state or local crime.

2.     You must not unlawfully possess a controlled substance.

3.     You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of
     release from imprisonment and at least two additional drug tests during the term of supervision, but not more than 120
     drug tests per year thereafter, as directed by the probation officer.
         ☐ The above drug testing condition is suspended, based on the court's determination that you
           pose a low risk of future substance abuse. *(check if applicable)*

4.    ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a
       sentence of restitution. *(check if applicable)*

5.    ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901,
       *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in
       which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the
Schedule of Payments of this judgment.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the
attached page.

**Add. 5**

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | | Judgment—Page | 4 | of | 7 |
|---|---|---|---|---|---|---|---|

DEFENDANT:      CARL LANGSTON
CASE NUMBER:    2:21-cr-166-GZS

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

**U.S. Probation Office Use Only**
A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature _____      Date _____

**Add. 6**

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
      Sheet 3D – Supervised Release

Judgment—Page   5   of   7

DEFENDANT:      CARL LANGSTON
CASE NUMBER:    2:21-cr-166-GZS

## SPECIAL CONDITIONS OF SUPERVISION

1) Defendant shall participate in mental health treatment, as directed by the supervising officer, until released from the program by the supervising officer. Defendant shall pay/co-pay for services during such treatment, to the supervising officer's satisfaction;

2) Defendant shall not use or possess any controlled substance, alcohol or other intoxicant; and shall participate in a program of drug and alcohol abuse therapy to the supervising officer's satisfaction. This shall include testing to determine if Defendant has used drugs or intoxicants. Defendant shall pay/co-pay for services during such treatment to the supervising officer's satisfaction. Defendant shall not obstruct or tamper, or try to obstruct or tamper, in any way, with any tests;

3) Defendant shall not associate with individuals consuming alcoholic beverages, shall not frequent business establishments whose primary product is alcoholic beverages, and shall not use any medication containing alcohol without permission from the supervising officer or a prescription from a licensed physician;

4) Defendant shall not own or possess any firearm or other dangerous weapon, or knowingly be at any time in the company of anyone known by the defendant to possess a firearm or other dangerous weapon; and

5) A United States probation officer may conduct a search of the defendant and of anything the defendant owns, uses, or possesses if the officer reasonably suspects that the defendant has violated a condition of supervised release and reasonably suspects that evidence of the violation will be found in the areas to be searched. Searches must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation of release.

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
      Sheet 5 – Criminal Monetary Penalties

Judgment—Page  6    of  7

DEFENDANT:       CARL LANGSTON
CASE NUMBER:   2:21-cr-166-GZS

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Count | Assessment | Restitution | Fine | AVAA Assessment * | JVTA Assessment ** |
|---|---|---|---|---|---|---|
| | One | $ 100 | $ 0 | $ 0 | | |
| **Totals:** | | $100 | $0 | $0 | | |

☐ The determination of restitution is deferred until     . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| **TOTALS** | $ | $ | |

☐ Restitution amount ordered pursuant to plea agreement  $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B   (Rev. 09/19) Judgment in a Criminal Case
         Sheet 6 – Schedule of Payments

| | Judgment—Page | 7 | of | 7 |
|---|---|---|---|---|

DEFENDANT:         CARL LANGSTON
CASE NUMBER:      2:21-cr-166-GZS

## **SCHEDULE OF PAYMENTS**

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**   ☒   Lump sum payment of $100 due immediately, balance due
        ☒   Any amount that the defendant is unable to pay now is due and payable during the term of incarceration. Upon release from
            incarceration, any remaining balance shall be paid in monthly installments, to be initially determined in amount by the supervising
            officer. Said payments are to be made during the period of supervised release, subject always to review by the sentencing judge on
            request, by either the defendant or the government.
        ☐   not later than                                                        , or
        ☐   in accordance with   ☐  C,   ☐  D,        ☐        E, or ☐ F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐  C,   ☐  D, or   ☐  F below); or

**C**   ☐   Payment in equal              *(e.g., weekly, monthly, quarterly)* installments of $          over a period of
                                *(e.g., months or years)*, to commence           *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**   ☐   Payment in equal              *(e.g., weekly, monthly, quarterly)* installments of $          over a period of
                                *(e.g., months or years)*, to commence           *(e.g., 30 or 60 days)* after release from imprisonment to a
            term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within          *(e.g., 30 or 60 days)* after release from
            imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

     Case Number
     Defendant and Co-Defendant Names                                    Joint and Several          Corresponding Payee,
     *(including defendant number)*              Total Amount              Amount                    if appropriate.


☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☒   The defendant shall forfeit the defendant's interest in the following property to the United States:
     The Defendant shall forfeit all property constituting or derived from any proceeds said Defendant obtained directly or
     indirectly as a result of the violations alleged in the charging instrument, any and all property used or intended to be
     used in any manner or part to commit and to facilitate the commission of the violations, including but not limited to: a
     Springfield Armory (HS Produkt), Model, XDS, .45 caliber pistol bearing serial number HG135281 and ten rounds of
     .45 ACP ammunition.


Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5)
fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution
and court costs.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| CARL LANGSTON | ) |

2021 OCT 21 P 3: 02

Docket No. 2:21-cr-166-GZS

DEPUTY CLERK

## INDICTMENT

The Grand Jury charges:

## COUNT 1
### (Felon in Possession of Firearm)

On about February 7, 2021, in the District of Maine, the defendant,

## CARL LANGSTON

knowing he had previously been convicted of crimes punishable by imprisonment for a term

exceeding one year, namely, Unlawful Trafficking in Scheduled Drugs, in the Cumberland

County Unified Criminal Court, in Portland, Maine, Docket No. CUMCD-CR-2011-05779, and

Theft by Unauthorized Taking or Transfer, in the Cumberland County Superior Court, in

Portland, Maine, Docket No. POSC-CR-2008-02515, knowingly possessed a firearm,

specifically, a Springfield Armory (HS Produkt), Model XDS, .45 caliber pistol, Serial No.

HG135281, and the firearm was possessed in and affecting commerce.

Thus, the defendant violated Title 18, United States Code, Section 922(g)(1) and

924(a)(2).

1

**Add. 10**

## FIREARM FORFEITURE ALLEGATION

Upon conviction of the offense in violation of Title 18, United States Code, Section 922(g)(1), set forth in Count 1 of this Indictment, the defendant,

### CARL LANGSTON

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), any firearm or ammunition involved in or used in any knowing commission of the offense, including but not limited to a Springfield Armory (HS Produkt), Model XDS, .45 caliber pistol, Serial No. HG135281 and 10 rounds of .45 ACP ammunition.

A TRUE BILL

Signature Redacted.  Original on File
at Clerk's Office

_____
FOREPERSON

10/21/2021

_____
ASSISTANT UNITED STATES ATTORNEY

2

**Add. 11**

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

2022 NOV 21  A 10: 24

UNITED STATES OF AMERICA )
                            )
       v.                    ) DEPUTY CLERK Crim. No. 2:21-cr-00166-GZS
                            )
CARL LANGSTON          )

**CONDITIONAL PLEA**
**(Rule 11(a)(2))**

My plea of guilty is conditional in that I reserve the right, on appeal from the judgment herein, to have an appellate court review this court's decision dated June 29, 2022, on my Motion to Suppress.

Date: 11/21/22 _____            _____
                                                Carl Langston, Defendant

Date: 11/21/22 _____            _____
                                                  Heather Gonzales, Esq.
                                                  Attorney for Defendant

The government hereby consents to the defendant's conditional plea.

Date: 9/14/2022 _____           _____
                                                  Johnathan G. Nathans
                                                  Assistant U.S. Attorney

The court hereby approves the defendant's conditional plea.

Date: 11/21/22 _____           _____
                                                  George Z. Singal
                                                  United States District Judge

1

**Add. 12**

2
**CERTIFICATE OF SERVICE**


I, Heather Gonzales, hereby certify that I have this date caused the within Notice of Appeal to be served upon Assistant United States Attorney Johnathan Nathans, Esq., by forwarding a copy to him via the Court's ECF System: johnathan.nathans@usdoj.gov.


Dated: April 6, 2023                                    /s/ Heather Gonzales
                                                       Counsel for the Defendant

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket no. 2:21-cr-00166-GZS |
| CARL LANGSTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Carl Langston's Motion to Suppress Evidence (ECF No. 39). On June 2, 2022, the Court held an in-person evidentiary hearing on this Motion. Having considered the evidence and arguments before it, the Court DENIES the Motion for the reasons stated herein.

## I.      FACTUAL FINDINGS

On the night of Saturday, February 6, 2021, Portland's Old Port neighborhood, home to many bars and restaurants, was busy. Pandemic-related restrictions on the hours of operation for many Old Port establishments had recently been lifted. As a result, the Portland Police Department ("PPD") was on alert given the neighborhood's reputation as an area prone to calls relating to alcohol consumption and physical violence.

Shortly before midnight, the PPD received a 911 call from a then-anonymous tipster reporting a disturbance outside The Bar, a bar located at 8 Exchange Street in the Old Port. According to dispatch, the tipster stated that "a black male wearing a black hat with horns . . . [was] yelling and had punched a white male that had a beard. . . . [T]he male that was punched is

**Add. 14**

gone now but the black male was still outside yelling."[1]  (Gov't Ex. 2, 00:00–00:25.)  The tipster

reportedly observed events from his apartment.  (Gov't Ex. 6.)

PPD Officers Garrick Rogers[2] and Ryan Cannell were dispatched to the scene, arriving

within a few minutes.  (See id.; Gov't Ex. 1, 11:00–11:10.)  Upon their arrival, the officers did not

observe an active disturbance or anyone matching the description provided.  They spoke to a

security guard (or "bouncer") at The Bar, which appeared relatively crowded.  It was not

uncommon for the officers to rely on information provided by such guards, who are able to keep

their eyes on customers throughout the night and note potential issues.  The guard confirmed there

had been an altercation but believed that a recurrence was unlikely unless the participants

encountered each other again somewhere else that night.  Officer Rogers credited the guard's

account and, roughly at midnight, radioed dispatch that everything was calm at The Bar and there

was no sign of a disturbance.  (See Gov't Ex. 6; Gov't Ex. 2, 00:40–00:46.)  Rogers and Cannell

then departed the scene.

Soon after the officers cleared the call, the same tipster called 911 again, this time

identifying himself as "Shawn" and providing his phone number and an apartment address of 11

Exchange Street.[3]  (See Gov't Ex. 6.)  At this point, Shawn stated that the man "that started the

fight" was "still in the bar."  (See id.)

---

[1] The "horns" on this hat were part of an embroidered design.

[2] Since his graduation from the Maine Criminal Justice Academy, Rogers has received crisis intervention training, verbal crisis training, medical training, and training on the laws of Maine, and also completed a Safe Streets course. At the time of the events described herein, Officer Rogers had been with the PPD for just over a year.

[3] This call was not conveyed over the radio by dispatch but appeared in the complete call log, which was accessible to the officers in their cruisers' onboard displays.  Compare Gov't Ex. 2 (recording), with Gov't Ex. 6 (call log).

**Add. 15**

Minutes later, the PPD received a 911 call from The Bar's manager, who was not on-site, conveying a report he had received from his on-site security guard.[4]   Based on this "thirdhand" report, dispatch relayed the following information over the radio:

> One of the males involved in the fight went to his car and grabbed a 1032 gun.  He's now looking for another male that he was fighting with.  They said he had a pistol in his coat.  Black male, 5′10″, maroon jacket with a grey hood.  He's currently outside the bar with his hand in his pocket.

(Gov't Ex. 2, 01:50–02:10 & 02:28–02:34; see also Gov't Ex. 6.)  Dispatch also relayed a report of a large group of people in the area.  (Gov't Ex. 2, 02:32–02:34.)  Rogers and Cannell were again dispatched to the scene, along with PPD Officer Zachary Theriault.[5]  (See id., 02:20–02:22.)

Within several minutes of the receipt of the manager's call, the officers began to arrive outside The Bar.  (See Gov't Ex. 1, 17:23–17:53; Gov't Ex. 6.)  Officer Rogers parked his vehicle and approached The Bar from the corner of Fore Street and Exchange Street.  (Gov't Ex. 3, 01:30.)  He saw an individual matching the description that had been provided via the relayed 911 calls: Black, 5′10″, wearing a hat with an embroidered horn design, and dressed in a maroon jacket over a grey hoodie.  This individual, who was later identified as Carl Langston, appeared to be arguing with another individual in a light grey jacket outside The Bar.

The man in the light grey jacket, who was later identified as Colton Carr, appeared to be blocking Langston's path into The Bar and had his hand on Langston, who in turn began pushing against him and toward the entrance.[6]  (Gov't Ex. 3, 01:47–01:52.)  At this point, Langston's hands

---

[4] The record remains unclear as to the source of the information relayed by the guard.

[5] Officer Theriault began his employment with the PPD in 2014.  His duties include field training and firearms instruction, and he is a member of the special reaction team.  For the last six and a half years, Theriault has worked the late-hour shift in the Old Port, often responding to calls involving disorderly conduct, fighting, public intoxication, and obstruction of traffic.

[6] Carr testified at the hearing that Langston was in fact his friend, and he was actually trying to convince Langston, who wished to go home, to reenter The Bar with him.

3

**Add. 16**

were not in his pockets.  (Id.)  As he approached, Rogers called out to Langston, "Put your hands

on your head."  (Id., 01:52–01:54.)  Langston turned toward Rogers.  (Id., 01:53.)  The officer

modeled what he wished Langston to do, placing his hands on his own head.  (Gov't Ex. 4, 01:20–

01:23.)  Langston replied, "Who?"  (Gov't Ex. 3, 01:54.)

Rogers repeated his command.  Retreating slightly from the officer, Langston replied,

"Nah."  (Id., 01:55.)  At this point, Langston was holding his right arm close against his body

across his right jacket pocket, where Rogers suspected a gun was located based on the report from

dispatch.  Rogers believed Langston was attempting to keep the gun from moving around or being

visible to the officer.  Rogers repeated his commands at least twice more, and Langston continued

to refuse.[7]  (Id., 01:55–01:57.)

While Langston was refusing to follow Rogers's directions, Officer Theriault approached

The Bar from the opposite direction, having parked his cruiser near the intersection of Milk Street

and Exchange Street.  (Gov't Ex. 4, 01:01–01:23.)  Theriault, too, found Langston to match the

description provided by dispatch.  He perceived Langston as agitated and thought that Carr was

trying to calm him down or keep him out of The Bar.  As he approached, Theriault perceived

Langston as refusing to comply with Rogers's commands.  Because he was approaching from

behind, Theriault could not see Langston's hands, so he believed Langston's hands were in his

jacket pockets.  Based on the prior information that the individual in question was armed, Theriault

was concerned that Langston might pull a weapon from his pocket.

At this point, Langston backpedaled such that he was within arms-reach of Theriault.  As

Langston turned around and discovered a second officer on the scene, Theriault immediately

grabbed Langston's right wrist and shoulder in order to deny him the opportunity to reach for a

---

[7] The Court notes that, when video of the stop was played during the hearing, Officer Rogers indicated that Langston said "no" in response to the officer's command.

weapon.  (Gov't Ex. 4, 01:24.)   Langston attempted to break the officer's hold and pull away.  (Gov't Ex. 3, 01:58–01:59.)   As this happened, Rogers also grabbed onto Langston, who continued to struggle.  (Id.)   Theriault then deliberately dropped to the ground, pulling Langston down on top of him.   As the three men continued to struggle on the ground, the officers believed that Langston was attempting to bring his hands to the front of his body, toward where they believed a gun was potentially located.  (See Gov't Ex. 1, 18:03–19:05; Gov't Ex. 3, 02:00–03:00; Gov't Ex. 4, 02:05–02:30.)   They endeavored to keep Langston's hands behind him.

During this time, Officer Cannell arrived on the scene and began assisting his colleagues in subduing Langston.  (Gov't Ex. 5, 03:39–03:52.)   At various points during the struggle, the officers directed Langston to stop resisting, to put his hands behind his back, and to get on his stomach.  (Gov't Ex. 3, 02:00–03:00.)   He did not comply with these commands.  (Id.)   After about a minute, the officers gained control of Langston's person and Officer Rogers handcuffed him.  (Id., 03:00–03:05.)   During the struggle, Officer Theriault sustained an abrasion on his knee.

At this point, Theriault, still partially entangled with Langston, noted the grip of a pistol in plain view in Langston's right pocket.   Officer Rogers also saw the weapon.   The officers secured the pistol and proceeded to search Langston's person for other weapons.  (Gov't Ex. 3, 03:56–04:00; Gov't Ex. 5, 05:50–06:50.)   Langston, now in handcuffs, was then walked to Theriault's cruiser.[8]   (Gov't Ex. 4, 04:51–05:16.)   After adjusting Langston's handcuffs in response to his complaints that they were too tight, Theriault conducted a more thorough search of Langston's person, which yielded an additional loaded magazine.

---

[8] During this time Langston repeatedly asked Officer Theriault, "What was the probable cause?"  In response, Officer Theriault told him, "You don't need probable cause to come talk to you.  You are a citizen in a public place."  Gov't Ex. 4, 04:53–04:58.

**Add. 18**

Langston was arrested for Refusing to Submit to Arrest or Detention, in violation of 17-A

M.R.S.A. § 751-B.  (See Def. Ex. 4.)  Although he refused to identify himself to the responding

officers, Langston was later identified by jail staff.  (See id., Bates No. 00000035.)

## II.      DISCUSSION

In October 2021, a federal grand jury charged Defendant with one count of felon in

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), based on his possession of a .45

caliber pistol on or about February 7, 2021.  (Indictment (ECF No. 28), PageID # 51.)  As noted

in the Indictment, prior to that date, Defendant had been convicted of two Maine felonies:  drug

trafficking and theft.  (Id.)

Defendant subsequently filed the present Motion to suppress all evidence obtained or

derived from the just-described police encounter.  Defendant advances two main grounds for

suppression.  First, he argues that the officers lacked reasonable suspicion to perform an

investigatory stop and weapons frisk under Terry v. Ohio, 392 U.S. 1 (1968).  (Def. Mot. (ECF

No. 39), PageID #s 71–73.)  Second, he asserts that even if the police initially had reasonable

suspicion to initiate the Terry stop, it evolved into a de facto arrest for which probable cause was

lacking.  (Id., PageID #s 73–74.).  The Court considers each of these arguments in turn.

### A.  Terry Stop & Frisk

The Fourth Amendment "does not pretermit all searches and seizures, but only those that

are unreasonable."  United States v. Rasberry, 882 F.3d 241, 246 (1st Cir. 2018).  "Way back in

1968, the Supreme Court held in Terry v. Ohio that officers may briefly detain a person based on

reasonable suspicion that he committed, is committing, or will soon commit a crime — 'even

though there is no probable cause to make an arrest.'"  United States v. Guerrero, 19 F.4th 547,

554 (1st Cir. 2021) (quoting Terry, 392 U.S. at 22).  In addition to allowing a brief detention, Terry

held that officers "may also frisk the person for weapons if they have reasonable suspicion that he

**Add. 19**

is 'armed and presently dangerous.'" Id. (quoting Terry, 392 U.S. at 30). However, "[t]he sole purpose of [a Terry frisk] is . . . to allow the officer to pursue his investigation without fear of violence." Id. (internal quotation marks omitted).

Generally, the constitutionality of a Terry stop and its accompanying frisk will be reviewed separately, although "[s]ometimes . . . the reasonable suspicion of a crime that justifies a stop will also justify a frisk because the very nature of the crime poses a sufficient risk that the stopped individual is armed and dangerous." United States v. Belin, 868 F.3d 43, 49 (1st Cir. 2017). As to a Terry stop, each stop "must be justified at its inception," and "[t]hen, as the stop proceeds, the officers' actions must be 'reasonably related in scope to the circumstances which justified the interference.'" Rasberry, 882 F.3d at 247 (quoting United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998)). "[I]f a stop begins as a Terry stop but becomes too intrusive, it will morph into a de facto arrest." Id. As to a Terry frisk, the dispositive question is "'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" Guerrero, 19 F.4th at 554 (quoting Terry, 392 U.S. at 27).

### 1. The Inception of the Stop

Before proceeding further, the Court must determine when this stop began for Fourth Amendment purposes. The answer to this question delimits what information can be attributed to the investigating officers for the purpose of establishing reasonable suspicion.

There are two main ways a Terry stop can start. First, the application of physical force with the intent to restrain constitutes a Fourth Amendment seizure regardless of whether the detainee submits to that force. See Torres v. Madrid, 141 S. Ct. 989, 1003 (2021). Second, "a stop instead may occur merely upon law enforcement making what the Supreme Court has termed a 'show of authority.'" United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016) (citing United

States v. Mendenhall, 446 U.S. 544, 553–54 (1980)).  However, a "show of authority effects a seizure only when the defendant actually yields or submits to the show of authority."  Id.

Here, if Langston had complied with Officer Rogers's commands to put his hands on his head, this may well have constituted a sufficient show of authority to begin the stop for Fourth Amendment purposes.  However, because Langston did not comply with Rogers's instructions, the Court deems the stop to have initiated when Officer Theriault first grabbed his wrist and shoulder.

### 2.    Was the Terry Stop Supported by Reasonable Suspicion?

"Reasonable suspicion requires there be both a particularized and an objective basis for suspecting the individual stopped of criminal activity."  United States v. Dapolito, 713 F.3d 141, 148 (1st Cir. 2013).  "The particularity requirement demands that the finding be 'grounded in specific and articulable facts.'"  Id. (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)).  "The objective requirement dictates that [the Court] view the circumstances through the lens of a reasonable police officer."  Id.  "The reasonable suspicion standard 'defies precise definition,' and 'must be determined case by case.'"  Id. (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)).  The standard "is based on the totality of the circumstances" and "entails a measurable degree of deference to the perceptions of experienced law enforcement officers."  United States v. Cruz-Rivera, 14 F.4th 32, 43–44 (1st Cir. 2021) (quoting United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008)).

Here, at the outset of the Terry stop, the responding officers had the following information at their disposal:  (1) the various accounts received from the three informants; (2) their own observations of Defendant's appearance and behavior immediately preceding the stop; and (3) their law enforcement training and experience, which included their experience policing the Old Port.

8

**Add. 21**

### a.   The Informants' Accounts

The Court turns first to the accounts received from the neighbor, the security guard, and the manager of The Bar.  "Information provided to police by third parties may create reasonable suspicion if the information contains sufficient 'indicia of reliability.'"  United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012) (quoting Alabama v. White, 496 U.S. 325, 328 (1990)).  "The reliability inquiry—like the reasonable suspicion inquiry itself—must be made in light of the totality of the circumstances."  United States v. Brown, 500 F.3d 48, 54 (1st Cir. 2007); see also United States v. White, 804 F.3d 132, 137 (1st Cir. 2015) (non-exhaustive list of factors for assessing reliability).  Importantly, for purposes of conducting a Terry stop, "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."  Florida v. J.L., 529 U.S. 266, 272 (2000).

As to the neighbor, Shawn, while this individual may have been initially reluctant to reveal his identity, by the time of the stop, he had disclosed his name, phone number, and address. Knowledge of a "tipster's name, phone number, and address . . . matters . . . because it . . . ups the chance that [law enforcement] can come down hard on the tipster if the tip is false, and that threat ups the chance that the tip is reliable."  United States v. Sanchez, 817 F.3d 38, 43 (1st Cir. 2016). It is also clear on the present record that this informant made his observations firsthand and made his reports either contemporaneously with, or soon after, the events he witnessed.  See Navarette v. California, 572 U.S. 393, 399–400 (2014) ("In evidence law, we generally credit the proposition that statements about an event and made soon after perceiving that event are especially trustworthy because substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." (internal quotation marks omitted)).  Furthermore, in his first call, he reported that the individual in question had punched another man—a violent, criminal act.  See id. (finding sufficiently reliable anonymous tip suggesting informant had eyewitness knowledge

**Add. 22**

of dangerous driving and reported the incident soon after it occurred).  It is true that Defendant's

absence from the scene during the officer's initial visit did not align with this informant's assertion

some minutes earlier that the man was "still outside yelling."  (Gov't Ex. 6); see also United States

v. Monteiro, 447 F.3d 39, 46 (1st Cir. 2006) ("When an initial police investigation into a tip of

illegal activity reveals factors inconsistent with the tip, the reasonable suspicion analysis must take

these indicia of unreliability into account along with any indicia of reliability.").  However, the

neighbor's account was largely borne out on the officers' second visit, when they encountered a

black man wearing a hat with an embroidered horn design who appeared agitated and engaged in

what appeared to be an argument outside The Bar.

      As to the information obtained directly from the security guard, the guard does not appear

to have provided an in-depth description of the combatants.  However, his account, obtained

firsthand by the officers investigating the initial 911 call, ultimately corroborated both of the other

accounts.  First, the guard acknowledged that there had been an altercation only minutes prior, as

reported by the neighbor.  Second, the account also predicted that there could be a recurrence if

the two individuals met again, lending credibility and urgency to the manager's later call reporting

that the individual had returned with a weapon in search of the man he had previously punched.

      As to the thirdhand account obtained from The Bar's manager, it lacks some indicia of

reliability when viewed in isolation.  To this day, the originator of the information conveyed by

the guard to the manager remains unknown and, as a result, the police were unable to gauge the

reliability of this individual directly.  See Monteiro, 447 F.3d at 45–48 (finding a "hearsay tip"

alone could not provide reasonable suspicion).  On the other hand, the account was detailed and

largely predicted what the responding officers found.  The manager's account was also

corroborated by the other informants, as all three imputed violent behavior to a single individual

**Add. 23**

within a short window of time.  Furthermore, the tip suggested an ongoing and imminent threat to public safety, which may be accorded special weight.  See id. at 49 (acknowledging "there may be a rationale for according special weight to anonymous tips in cases of an imminent threat to public safety" (citing J.L., 529 U.S. at 273–74)); see also Ruidíaz, 529 F.3d at 31 n.2 (relevant to reliability inquiry that tip "referenced an ongoing emergency," as "reports about ongoing emergencies, by virtue of their very nature, necessitate quick action").  In sum, the manager's call is relevant to the evaluation of the totality of the circumstances, even if it may have been insufficiently reliable to support reasonable suspicion by itself. [9]

Defendant suggests that reasonable suspicion is lacking because Rogers and Theriault did not stop to further investigate the credibility of the manager's account.  (See Def. Reply, PageID # 100.)  It is true that "Terry stops may become . . . less reasonable if the police have had the time to develop better grounds for the stop but have failed to do so."  Monteiro, 447 F.3d at 49 (internal quotation marks omitted).  However, this is not such a case.  First, as discussed, the manager's account was not the only information at the officers' disposal at the time of the stop. Second, this was not a case where the officers "had the time."  Id.  Importantly, the manager's account suggested a potentially imminent crime, which officers could still step in to prevent, as opposed an already completed one for which haste would be less urgent.  See Hensley, 469 U.S. at 228 (noting "factors in the balance may be somewhat different" when "a stop to investigate ongoing criminal conduct" is involved rather than "a stop to investigate past criminal activity").

---

[9] During the hearing, Defendant focused in significant part on the shortcomings of the manager's tip when viewed in isolation.  However, a report's mutual corroboration by multiple independent sources is a highly material indicator of reliability.  See United States v. Vandergroen, 964 F.3d 876, 880 (9th Cir. 2020) ("The existence of multiple tipsters, though anonymous, mitigates the specter of 'an unknown, unaccountable informant . . . seeking to harass another [by] set[ting] in motion an intrusive, embarrassing police search' by relaying false information." (alterations in original) (quoting J.L., 529 U.S. at 271–72)).  Here, the reports obtained from these three informants were not contradictory but, rather, mutually corroborative where they overlapped.

### b. The Officers' Observations & Experience

Beyond the three corroborating accounts, the Court's analysis of the totality of the circumstances must also consider the officers' observations upon their arrival at the scene. First, Defendant's appearance matched the descriptions provided by both the neighbor and the manager, further corroborating both informants' accounts. See Jones, 700 F.3d at 622 ("Corroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip." (quoting United States v. Greenburg, 410 F.3d 63, 69 (1st Cir. 2005)). Additionally, having viewed all of the footage entered into evidence in this case, the Court agrees that a reasonable officer would have found that Langston appeared to be agitated and in a dispute with an individual who seemed to be preventing him from entering a crowded bar.[10] The video evidence also shows that Langston's right arm was held in a position that would align with the presence of a weapon, further corroborating the manager's account that Langston possessed a weapon.[11] While reasonable suspicion must be based on "more than just nervousness and furtive movements in questionable surroundings," the information is nonetheless part of the totality of the circumstances. United States v. Awer, 770 F.3d 83, 91 (1st Cir. 2014); see also id. at 91–92 (finding no basis for clear error in district court's finding that various movements were "suspicious"). Furthermore, from Theriault's perspective it appeared that Langston's hands were actually *in* his pockets, corroborating that part of the manager's call as well.

---

[10] The Court acknowledges Carr's testimony that this encounter may have been friendlier than it appeared, but the officers did not have this context and the Court finds their impression of the scene they observed to have been objectively reasonable.

[11] Although possession of a firearm can be innocent, the corroboration of this part of the call nonetheless adds credibility to the manager's other assertions. See Jones, 700 F.3d at 622; cf. United States v. Centeno-González, 989 F.3d 36, 46 (1st Cir. 2021) (in reviewing a warrantless arrest, finding officers' observation of "entirely innocent" conduct "enough to corroborate the information provided by . . . two callers").

Also, Langston repeatedly refused to cooperate with Rogers's commands to place his hands on his head.  "[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437 (1991) (citations omitted).  Here, however, Langston's refusal was far from the only factor present and it undeniably and reasonably increased the level of suspicion, particularly given the officers' experience with the Old Port and the people frequenting its establishments on a weekend night. See United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) ("[P]olice are permitted to take the character of a neighborhood into account when assessing whether a stop is appropriate," albeit "it is only one factor that must be looked at alongside all the other circumstances when assessing the reasonableness of the officers' fear for their safety.").

### c.  Conclusion on Reasonable Suspicion at Outset of Terry Stop

Reviewing the totality of the circumstances, the Court concludes that the stop was supported at the outset by reasonable suspicion.  The officers had reasonable suspicion to believe that Langston had committed a crime and was poised to commit another.  Specifically, the Court finds that the officers had reasonable suspicion that Langston had punched another individual earlier in the night and was poised to menace this same individual with a firearm within the close confines of a crowded bar.

### 3.  Was the Terry Frisk Supported by Reasonable Suspicion?

As to the Terry frisk, "[w]hen an officer has a reasonable suspicion that a crime of violence has occurred, the same information that will support an investigatory stop will *without more* support a frisk." United States v. Mouscardy, 722 F.3d 68, 75 (1st Cir. 2013) (internal quotation marks omitted) (emphasis in original).  As just noted, the officers here had reasonable suspicion to believe that Langston had assaulted another individual shortly before they encountered him outside The Bar.  The Court's analysis could therefore very well end here.

**Add. 26**

Nonetheless, the Court alternatively concludes that the combination of the informants' statements, the position of Langston's arm close to his pocket, his apparent agitation, his apparent attempt to enter The Bar, and his refusal to place his hands on his head independently provided the officers reasonable suspicion to believe that he was armed and posed a danger to the safety of both the officers themselves and the innocent bystanders in and around The Bar. See id., at 75–76 (concluding that pat-frisk was justified in part by the "conduct and disposition" of individual who "became agitated and nervous" during stop); United States v. Dubose, 579 F.3d 117, 122 (1st Cir. 2009) (suspect's refusal to remove hand from pocket contributed to reasonable suspicion); United States v. Soares, 521 F.3d 117, 121 (1st Cir. 2008) (suspect's refusal of order to keep hands in view contributed to reasonable suspicion); see also Terry, 392 U.S. at 27 ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). This finding is further buttressed by the responding officers' experience and training, along with the reputation of the area.[12] See United States v. Arvizu, 534 U.S. 266, 273 (2002) (Reasonable suspicion analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (internal quotation marks omitted)).

---

[12] The Court further notes that the Terry frisk, unlike the broader investigatory stop, did not commence until after the minute-long struggle on the ground. Accordingly, the officers could also look to Defendant's conduct during that struggle, including his noncompliance with their repeated commands. See, e.g., United States v. Cardona-Vicente, 817 F.3d 823, 828 (1st Cir. 2016) (Although the "violation that justified the initial stop . . . would have been clearly insufficient to justify a pat-frisk, several factors became apparent as the . . . stop progressed which were sufficient to give rise to a reasonable suspicion that there was a gun in [defendant's possession]."); Soares, 521 F.3d at 120.

### 4.   Evolution of the <u>Terry</u> Stop

The Court now turns to Defendant's argument that the officers' actions exceeded the bounds of a permissible <u>Terry</u> stop and engaged in a de facto arrest, which must be supported by probable cause, a higher standard than reasonable suspicion.  (Def. Mot., PageID #s 73–74.)

The "dispositive question" for determining whether a <u>Terry</u> stop has morphed into a de facto arrest "is whether a reasonable person standing in the suspect's shoes would understand his position 'to be tantamount to being under arrest.'"  <u>Rasberry</u>, 882 F.3d at 247 (quoting <u>United States v. Zapata</u>, 18 F.3d 971, 975 (1st Cir. 1994)).  That said, during a <u>Terry</u> stop officers are "allowed . . . to take measures that are reasonably calculated to protect themselves or others from harm," so long as "such prophylactic measures [are] proportionate to the perils associated with the particular circumstances."  <u>Id.</u>  "Security precautions, such as the use of handcuffs, must be based on the officers' 'reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.'"  <u>Id.</u> at 247–48 (quoting <u>Acosta-Colon</u>, 157 F.3d at 19); <u>see also</u> <u>United States v. Pontoo</u>, 666 F.3d 20, 30–31 (1st Cir. 2011) (explaining that "prophylactic measures can be employed in combination").

Here, the steps the officers took were proportionate and responsive to the circumstances that emerged during the stop.  First, the officers, already in receipt of three mutually corroborative informant accounts, discovered Langston in an agitated state and believed he was attempting to enter The Bar.  When Langston then failed to place his hands on his head and submit to a verbal show of authority, the officers were justified in seeking to physically restrain him.  When Langston reacted by pulling away and struggling with Officer Theriault, it was reasonable for the officers to take further steps to subdue him.  When the officers came to believe Langston was actively attempting to access his front pocket, where they suspected he had a gun, it became reasonable to

pin his hands behind his back and handcuff him.  See, e.g., Rasberry, 882 F.3d at 248; United States v. Meadows, 571 F.3d 131, 141 (1st Cir. 2009) (distinguishing use of handcuffs in Acosta-Colon, where "no facts justified the handcuffing, since nothing indicated resistance or belligerence" and "there was no evidence that any of the . . . officers harbored an actual suspicion that [defendant] was armed") (internal quotation marks omitted)); United States v. Maguire, 359 F.3d 71, 77–79 (1st Cir. 2004) (concluding stop did not amount to a de facto arrest although the defendant, armed with a knife, had been "wrestled to the ground" by officers).

In the Court's view, the facts of this case do not rise to the level of a de facto arrest.

**B.  Search Incident to Arrest**

That said, the Government alternatively argues that even if the Terry stop here were unconstitutional, the officers were entitled to search Defendant's person under the search incident to arrest exception to the Fourth Amendment's warrant requirement.  (Gov't Response, PageID #s 91–93.)  Under this exception, officers carrying out a lawful arrest have the authority to make a warrantless search of the arrestee's person.  See, e.g., Birchfield v. North Dakota, 579 U.S. 438, 458–61 (2016) (discussing provenance of exception).  "The search incident to arrest warrant exception is premised on protecting officers and preventing evidence destruction[.]"  Alasaad v. Mayorkas, 988 F.3d 8, 17 (1st Cir. 2021).  Despite these narrow underpinnings, it has long since been established that "[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence.  The fact of a lawful arrest, standing alone, authorizes a search."  Maryland v. King, 569 U.S. 435, 449 (2013) (quoting Michigan v. DeFillippo, 443 U.S. 31, 35 (1979)).

The Court agrees with the Government.  Once Langston refused to comply with the officers' directions and then used physical force against them, they had probable cause to believe he had committed the crime of Refusing to Submit to Arrest or Detention, in violation of 17-A

**Add. 29**

M.R.S.A. § 751-B.[13]  Accordingly, the officers had grounds to arrest him for that intervening crime and conduct a search incident to arrest.[14]

## III.        CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence (ECF No. 39) is hereby DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 29th day of June, 2022.

---

[13] "A person is guilty of refusing to submit to arrest or detention if, with the intent to hinder, delay or prevent a law enforcement officer from effecting the arrest or detention of that person, the person . . . [r]efuses to stop on request or signal of a law enforcement officer . . . ; [u]ses physical force against the law enforcement officer . . . ." 17-A M.R.S.A. § 751-B(1)(A) & (B).  Defendant's conduct implicated the just-quoted portions of the statute.

Insofar as Defendant argued during the hearing that his resistance was defensible, the Court finds no basis for this assertion.  Putting aside all other issues, the argument fails on its own terms.  Section 751-B contains two defenses, neither of which apply here.  A more general defense is located in 17-A M.R.S.A. § 108(1-A).  Under this defense, "[a] person is justified in using the degree of nondeadly force the person reasonably believes is necessary to defend the person . . . against a law enforcement officer who, in effecting an arrest or detention, uses nondeadly force not justified under section 107, subsection 1."  However, the Court does not find any basis to conclude that Defendant reasonably believed he needed to defend himself.  This was not suggested by the evidence before the Court, and Defendant freely chose not to testify.  Accordingly, this defense, too, is precluded.

[14] To be clear, Defendant's commission of a new crime during the intervening period between the Terry stop and the search does not retroactively affect the constitutionality of the Terry stop.  Rather, it implicates an exception to the exclusionary rule, the so-called "attenuation doctrine," under which "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance[.]"  Utah v. Strieff, 579 U.S. 232, 238 (2016) (internal quotation marks omitted).  The Court finds the facts here to resemble past examples of cases where the First Circuit has applied this exception.  See United States v. King, 724 F.2d 253, 256 (1st Cir. 1984) (assuming illegality of initial police conduct but denying suppression of evidence against passenger when driver of car committed intervening act of shooting at officers and thereby provided probable cause to search); cf. United States v. Camacho, 661 F.3d 718, 722, 730–31 (1st Cir. 2011) (granting suppression of evidence where defendant's resistance of officers occurred after discovery of weapon during illegal frisk and was therefore not intervening act).