# CA No. 23-1337

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

CARL LANGSTON,

Defendant-Appellant.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

## BRIEF OF APPELLEE UNITED STATES OF AMERICA

Darcie N. McElwee
United States Attorney

Benjamin M. Block
Assistant U.S. Attorney
100 Middle Street
East Tower, Sixth Floor
Portland, ME 04101
(207) 780-3257

# TABLE OF CONTENTS

Table of Authorities.................................................................iv

Statement of Issues Presented.............................................x

Statement of the Case ...........................................................1

Statement of Facts .................................................................3
    A.    Suppression Proceedings ......................................3
        1.    The District Court's Factual Findings..........................3
        2.    The District Court's Legal Analysis .............................8
            a.    A Lawful *Terry* Stop.............................................9
            b.    Not a De Facto Arrest ........................................12
            c.    Search Alternatively Lawful as Incident to Arrest .................................................13
    B.    Sentencing Proceedings ......................................13
        1.    The Presentence Investigation Report .......................13
        2.    The Sentencing Hearing ...........................................14
            a.    The Brook Casino Incident ................................15
            b.    Acceptance of Responsibility .............................18
            c.    The Guidelines Calculation and Sentence .........19

Summary of Arguments ........................................................20

Argument...............................................................................22
I.     THE DISTRICT COURT CORRECTLY FOUND THAT THE OFFICERS HAD REASONABLE SUSPICION TO DETAIN LANGSTON BASED ON WITNESS REPORTS, THEIR OWN OBSERVATIONS, AND LANGSTON'S BEHAVIOR. (Appellant's Issue 2) ................................................................22
    A.    Standard of Review ............................................22
    B.    Discussion...........................................................23

II.    THE DISTRICT COURT DID NOT PLAINLY ERR IN FINDING LANGSTON POSSESSED A FIREARM IN CONNECTION WITH ANOTHER FELONY. (Appellant's Issue 3)...................................29
    A.    Standard of Review ............................................29

    B.      Discussion...................................................................30

          1.      Langston waived this claim ........................................31

          2.      There was no error, much less plain error, by the
                 district court .............................................................32

III.  THE DISTRICT COURT SUPPORTABLY FOUND THAT
     LANGSTON CONSUMED ALCOHOL IN VIOLATION OF HIS
     PRETRIAL RELEASE CONDITIONS AND APPROPRIATELY
     DENIED HIM ACCEPTANCE OF RESPONSIBILITY.
     (Appellant's Issues 4 and 5) ..........................................36

    A.     Standard of Review ...........................................................36

    B.     Discussion...................................................................37

          1.      The district court reasonably found the written
                 statements of law enforcement and casino employees to
                 be sufficiently reliable for purposes of sentencing ......37

          2.      The district court reasonably denied Langston
                 acceptance of responsibility credit due to his
                 misconduct while on pretrial release...........................43

IV.  ON PLAIN ERROR REVIEW, 18 U.S.C. § 922(g)(1) REMAINS
     CONSTITUTIONAL AS APPLIED TO LANGSTON, A FIVE-
     TIME FELON PREVIOUSLY CONVICTED OF ROBBERY AND
     DRUG TRAFFICKING. (Appellant's Issue 1) ...............47

    A.     Standard of Review ...........................................................48

    B.     Section 922(g)(1) is Constitutional Under the Precedents of
         Both the Supreme Court and this Court .............................48

          1.      The Supreme Court held in *Heller* that the Second
                 Amendment protects an individual right of law-abiding
                 citizens.....................................................................49

          2.      Following *Heller*, this Court has upheld the
                 constitutionality of § 922(g)(1) ...................................51

          3.      *Bruen* does not undermine *Torres-Rosario*..................53

    C.     Even if *Bruen* Had Abrogated this Court's Precedent,
         Langston Cannot Show Plain Error .....................................56

          1.      There was no error because the Second Amendment
                 permits the dispossession of felons..............................56

2.    Any error was not plain because there is a split of
      Circuit authority regarding the constitutionality of
      § 922(g)(1) ..................................................................... 59
3.    There was no effect on Langston's substantial rights,
      because he has not established that he is nonviolent..
      ........................................................................................ 61

Conclusion ............................................................................. 64

# TABLE OF AUTHORITIES

## Federal Cases

*Arizona v. Johnson*, 555 U.S. 323 (2009) .................................................. 23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................... *passim*

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ............................................. 26

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...................................... 58

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................... 49, 51

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) .............................. 57

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)
................................................................................................ *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York,* 140 S.Ct.
1525 (2020) ................................................................................. 54

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ......................... 60

*Richardson v. Ramirez*, 418 U.S. 24 (1974) .......................................... 57

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) .......................... 35

*Spencer v. Kemna*, 523 U.S. 1 (1998) ................................................. 57

*Stokeling v. United States*, 139 S.Ct. 544 (2019) ................................. 62

*Tennessee v. Garner*, 471 U.S. 1 (1985) .............................................. 58

*Terry v. Ohio*, 392 U.S. 1 (1968) ..................................................... 8, 23

*United States v. Acevedo-López*, 873 F.3d 330 (1st Cir. 2017) .............. 42

*United States v. Andino-Morales*, 73 F.4th 24 (1st Cir. 2023) .............. 35

*United States v. Arthur*, 764 F.3d 92 (1st Cir. 2014) ....................... 24, 25

*United States v. Aymelek*, 926 F.2d 64 (1st Cir. 1991) ........................ 38

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011)...............................52

*United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013)...............................55

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011).......................51, 52

*United States v. Bowers*, No. 22-6095, 2024 WL 366247 (6th Cir. Jan 31, 2024)....................................................................................61

*United States v. Brake*, 666 F.3d 800 (1st Cir. 2011)..............................26

*United States v. Brake*, 904 F.3d 97 (1st Cir. 2018)...............................31

*United States v. Brillon*, No. 22-2956-cr, 2024 WL 392949 (2d Cir. Feb. 2, 2024)..............................................................................55, 60

*United States v. Camacho*, 661 F.3d 718 (1st Cir. 2011).........................27

*United States v. Caparotta*, 676 F.3d 213 (1st Cir. 2012)......................30

*United States v. Casey*, 825 F.3d 1 (1st Cir. 2016)................................30

*United States v. Chhien*, 266 F.3d 1 (1st Cir. 2001)..............................24

*United States v. Claybrooks*, 90 F.4th 248 (4th Cir. 2024)....................60

*United States v. Clemens*, 738 F.3d 1 (1st Cir. 2013).......................48, 56

*United States v. Colón-Maldonado*, 953 F.3d 1 (1st Cir. 2020)........38, 39

*United States v. Cortez*, 449 U.S. 411 (1981)......................................23

*United States v. Crocco*, 15 F.4th 20 (1st Cir. 2021)..............................60

*United States v. deJesús*, 6 F.4th 141 (1st Cir. 2021)......................44, 46

*United States v. Deppe*, 509 F.3d 54 (1st Cir. 2007)..............................44

*United States v. Diaz*, 285 F.3d 92 (1st Cir. 2002)...................48, 56, 59

*United States v. Dietz*, 950 F.2d 50 (1st Cir. 1991)..........................29, 30

*United States v. Dubois*, --- F.4th ---, 2024 WL 927030 (11th Cir. Mar. 5, 2024) ....................................................................................... 56

*United States v. Eisom*, 585 F.3d 552 (1st Cir. 2009) ........................... 31

*United States v. Fields*, 823 F.3d 20 (1st Cir. 2016) ............................. 9

*United States v. Galvan*, No. 22-11239, 2024 WL 485701 (5th Cir. Feb. 8, 2024) ........................................................................................ 60, 61

*United States v. Garrasteguy*, 559 F.3d 34 (1st Cir. 2009) ................... 37

*United States v. González*, 857 F.3d 46 (1st Cir. 2017) ........................ 33

*United States v. Hensley*, 469 U.S. 221 (1985) ............................... 23, 24

*United States v. Hill*, No. 22-2400, 2023 WL 2810289 (7th Cir. Apr. 6, 2023) ............................................................................................. 61

*United States v. Ivery*, 427 F.3d 69 (1st Cir. 2005) .............................. 22

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) ............. 58, 59, 60

*United States v. John*, 59 F.4th 44 (1st Cir. 2023) ................................. 3

*United States v. Jones*, 432 F.3d 34 (1st Cir. 2005) .............................. 24

*United States v. Jordan*, 549 F.3d 57 (1st Cir. 2008) ...................... 37, 43

*United States v. Lilly*, 65 F.4th 38 (1st Cir. 2023) ............................... 37

*United States v. Madsen*, 809 F.3d 712 (1st Cir. 2016) .................... 30, 35

*United States v. Marcano*, 525 F.3d 72 (1st Cir. 2008) .................... 59, 60

*United States v. Mayendía-Blanco*, 905 F.3d 26 (1st Cir. 2018) ............ 24

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ................... 56

*United States v. McCarthy*, 32 F.4th 59 (1st Cir. 2022) .................. 45, 46

*United States v. McLaughlin*, 378 F.3d 35 (1st Cir. 2004) .............. 44, 45

*United States v. Mills*, 710 F.3d 5 (1st Cir. 2013) ............................... 39

*United States v. Monteiro*, 447 F.3d 39 (1st Cir. 2006) .......................... 26

*United States v. Ortíz-Mercado*, 919 F.3d 686 (1st Cir. 2019) .............. 48

*United States v. Padilla*, 415 F.3d 211 (1st Cir. 2005) .......................... 30

*United States v. Qin*, 57 F.4th 343 (1st Cir. 2023) ................................. 28

*United States v. Ramirez-Frechel*, 23 F.4th 69 (1st Cir. 2022) .............. 62

*United States v. Rasberry*, 882 F.3d 241 (1st Cir. 2018) ....................... 12

*United States v. Rivera-Rivera*, 555 F.3d 277 (1st Cir. 2009) ............... 23

*United States v. Rivera-Ruiz*, 43 F.4th 172 (1st Cir. 2022) ................... 37

*United States v. Rodriguez*, 336 F.3d 67 (1st Cir. 2003) ................. 38, 40

*United States v. Rodríguez-Pacheco*, 948 F.3d 1 (1st Cir. 2020) ........... 22

*United States v. Romero*, 906 F.3d 196 (1st Cir. 2018) ......................... 59

*United States v. Royer*, 895 F.2d 28 (1st Cir. 1990) ............................... 44

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) ........................ 56

*United States v. Ruidiaz*, 529 F.3d 25 (1st Cir. 2008) ...................... 26, 28

*United States v. Saxena*, 229 F.3d 1 (1st Cir. 2000) ......................... 44, 46

*United States v. Sierra-Ayala*, 39 F.4th 1 (1st Cir. 2022) ..................... 23

*United States v. Spinks*, 63 F.4th 95 (1st Cir. 2023) ................................. 3

*United States v. Stroman*, 500 F.3d 61 (1st Cir. 2007) .......................... 27

*United States v. Tavares*, 705 F.3d 4 (1st Cir. 2013) ............................. 43

*United States v. Thompson*, 62 F.4th 37 (1st Cir. 2023) ........................ 59

*United States v. Torres*, 162 F.3d 6 (1st Cir. 1998) ............................... 29

*United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011) .. 51, 52, 55, 59

*United States v. Turbides–Leonardo*, 468 F.3d 34 (1st Cir. 2006) .........32

*United States v. Volungus*, 595 F.3d 1 (1st Cir. 2010) ...........................48

*United States v. Wright*, 485 F.3d 45 (1st Cir. 2007)............................26

*Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023)........................55, 56

*Williams v. United States*, 503 U.S. 193 (1992)....................................43

## Federal Statutes

18 U.S.C. § 922(g)(1).............................................................. *passim*

21 U.S.C. § 844 .............................................................................45

28 U.S.C. § 1865(b)(5)...................................................................57

## State Cases

*State v. Filler,* 3 A.3d 365 (Me. 2010) .......................................45

## State Statutes

17-A M.R.S.A. § 207(1)(A) ............................................................45

17-A M.R.S.A. § 651(1)(C) ............................................................62

17-A M.R.S.A. § 751-B....................................................................8

17-A M.R.S.A. § 752-A(1)(A) ....................................... 2, 8, 13, 29, 34

## Federal Rules

U.S.S.G. § 2K2.1(b)(6)(B) ..........................................................2, 13

U.S.S.G. § 3E1.1 ...........................................................................46

U.S.S.G. § 3E1.1(a).................................................................43, 44

U.S.S.G. § 3E131, cmt. n.1(B) ......................................................44

U.S.S.G. § 6A1.3(a).......................................................................38

# Other Authorities

4 William Blackstone, Commentaries on the Laws of England (1st ed. 1769) ................................................................................. 58

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms,* 20 Wyo. L. Rev. 249 (2020) ................................................................................................. 58

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) ........................................................................................ 57

S. Rep. No. 90-1097 (1968) ................................................... 49

U.S. Const. amend. II ............................................................. 50

## STATEMENT OF ISSUES PRESENTED

I. WHEN POLICE OFFICERS APPROACHED LANGSTON OUTSIDE A BAR TO INVESTIGATE REPORTS THAT A MAN MATCHING LANGSTON'S DESCRIPTION HAD BEEN IN A BAR FIGHT AND POSSESSED A FIREARM, LANGSTON REFUSED COMMANDS TO PLACE HIS HANDS ON HIS HEAD AND FOUGHT WITH THE OFFICERS. DID THE DISTRICT COURT CORRECTLY FIND THAT THE OFFICERS HAD REASONABLE SUSPICION TO DETAIN LANGSTON BASED ON THE WITNESS REPORTS, THEIR OWN OBSERVATIONS, AND LANGSTON'S BEHAVIOR? (Appellant's Issue 2)

II. AT SENTENCING, THE DISTRICT COURT INCREASED LANGSTON'S GUIDELINES RANGE, FINDING THAT LANGSTON POSSESSED A FIREARM IN CONNECTION WITH A FELONY ASSAULT ON A POLICE OFFICER. DID THE COURT PLAINLY ERR IN DOING SO? (Appellant's Issue 3)

III. WHETHER THE DISTRICT COURT SUPPORTABLY FOUND THAT LANGSTON CONSUMED ALCOHOL IN VIOLATION OF HIS PRETRIAL RELEASE CONDITIONS AND APPROPRIATELY DENIED HIM ACCEPTANCE OF RESPONSIBILITY. (Appellant's Issues 4 and 5).

IV. WHETHER, ON PLAIN ERROR REVIEW, 18 U.S.C. § 922(g)(1) REMAINS CONSTITUTIONAL AS APPLIED TO LANGSTON, A FIVE-TIME FELON PREVIOUSLY CONVICTED OF ROBBERY AND DRUG TRAFFICKING. (Appellant's Issue 1)

## STATEMENT OF THE CASE

In the early morning hours of February 7, 2021, police officers
approached appellant Carl Langston outside a bar in Portland, Maine,
to investigate reports that a man matching Langston's description had
previously been involved in a bar fight and had returned to the bar with
a gun. Add. 14-16.[1] Langston refused commands to place his hands on
his head, then fought with police when they attempted to detain him.
Add. 17-18. After successfully restraining Langston, the police officers
seized a loaded gun they observed sticking out of his jacket pocket. Add.
18. Later, during a more thorough pat-down, an officer recovered
another loaded magazine from Langston's pocket. Add. 18; RA 97.

A grand jury sitting in the District of Maine charged Langston
with unlawful possession of a firearm by a convicted felon, in violation
of 18 U.S.C. § 922(g)(1). D 28; Add. 10. Langston moved to suppress the
items seized from him, arguing that the police lacked reasonable

---

[1] Citations herein are as follows: matters on the district court's
docket as "D[#];" Record Appendix as "RA [pg#];" Sealed Appendix as
"SA [pg#];" Defendant-Appellant's Addendum as "Add. [pg#],"
Defendant-Appellant's opening brief as "D.Br. [pg#]"; and Government's
Appendix as "GA [pg#]."

suspicion to detain him or probable cause to arrest him, and therefore violated his Fourth Amendment rights. D 39; RA 13-20. Following a hearing, D 57, RA 24-152, the district court (Singal, J.) denied Langston's motion. D 61; Add. 14-30. Langston entered a conditional guilty plea to the Indictment, reserving the right to appeal the district court's suppression ruling. D 78, 80; Add. 12; RA 153.

While on release pending sentencing, Langston was involved in an incident at a casino in New Hampshire that resulted in Langston being taken into protective custody by law enforcement due to suspected intoxication. RA 187-189; RA 288-289; GA 22-23. Langston failed to report the police contact to his probation officer in a timely manner. GA 22-23; RA 288-289. Based on these violations of his conditions of release, the district court denied Langston credit for acceptance of responsibility under the sentencing guidelines. RA 205-206. The district court also, without objection and following the recommendation in the presentence investigation report, applied a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B), finding that Langston possessed the firearm in connection with another felony, namely assault on a law enforcement officer in violation of 17-A M.R.S.A. § 752-A(1)(A). SA 262;

RA 171, 229. Ultimately, the court sentenced Langston to 57 months'
incarceration, the low end of his advisory guidelines sentencing range.
RA 229, 231.

Langston filed a timely notice of appeal. D 106; Add. 1. He now
challenges the constitutionality of the statute of conviction, the legality
of his initial detention, and the district court's sentencing guidelines
calculation. D.Br. 20-50.

## STATEMENT OF FACTS[2]

**A.    Suppression Proceedings**

**1.    The District Court's Factual Findings**

Shortly before midnight on February 6, 2021, the Portland Police
Department received a call regarding a fight outside The Bar on
Exchange Street in Portland. Add. 14. Located in the Old Port

---

[2]     On appeal, Langston raises both a suppression issue and a
sentencing issue. As to the suppression issue, the relevant facts are
taken from the district court's factual findings in its June 29, 2022
order denying Langston's motion to suppress, supplemented with
undisputed facts drawn from the suppression hearing. *United States v.
John,* 59 F.4th 44, 45-46 (1st Cir. 2023). As to the sentencing issue,
because this appeal follows Langston's guilty plea, the relevant facts
are taken from the prosecution version, the undisputed sections of the
presentence report, and the transcripts of key court hearings. *United
States v. Spinks*, 63 F.4th 95, 97 (1st Cir. 2023).

neighborhood, police knew that area to be busy and "prone to calls relating to alcohol consumption and physical violence." *Id.* The tipster, who at that time did not identify himself, described a fight in which "a black male wearing a black hat with horns . . . had punched a white male that had a beard."[3] *Id.* While the white male had left the area, the tipster indicated that the black man "was still outside yelling." Add. 15.

Officers Garrick Rogers and Ryan Cannell arrived at the scene within a few minutes but did not see anyone matching the description of the participants in the fight, nor was there an ongoing disturbance. *Id.* The officers spoke with the bouncer (an on-site security guard) at The Bar, who confirmed that there had been an altercation but did not anticipate any future incident unless the two men ran into each other again elsewhere in the Old Port. *Id.* Officer Rogers radioed dispatch that the scene was calm, then he and Officer Cannell left the area. *Id.*

Shortly thereafter, the original tipster called 911 again. *Id.* This time, he identified himself by name and provided his phone number and address. *Id.* He stated that the man who "started the fight" was "still in

---

[3] The "horns" were part of an embroidered design on the hat. Add. 15 n.1.

the bar." *Id.* Within minutes, the manager of The Bar also called 911 to report that the bouncer told him one of the participants in the fight had returned with a gun.[4] Add. 16. Based on the manager's report, dispatch radioed out the following information:

> One of the males involved in the fight went to his car and grabbed a 1032 gun. He's now looking for another male that he was fighting with. They said he had a pistol in his coat. Black male, 5'10", maroon jacket with a grey hood. He's currently outside the bar with his hand in his pocket.

*Id.* Dispatch also indicated that there was a large group of people in the area. *Id.*

Officers Rogers and Cannell, as well as Officer Zachary Theriault, responded to the scene a few minutes after the manager's call. *Id.* As Officer Rogers approached, he saw an individual who matched the description given over the radio: a black male, approximately 5'10" tall, wearing a hat with an embroidered horn design, a maroon jacket, and grey hoodie. *Id.* The man, later identified as Langston, appeared to be arguing with another person, who seemed to be blocking Langston from

---

[4]    This information was "thirdhand," as the manager was not on the premises and the source of the bouncer's information was not known. Add. 16.

entering The Bar. *Id.* Langston appeared to be pushing against the man

toward the entrance. *Id.* Langston's hands were not in his pockets at

that time. Add. 16-17.

Officer Rogers instructed Langston to put his hands on his head.

Add. 17. Langston turned towards the officer, at which point Rogers

modeled what he wanted Langston to do. *Id.* Langston replied, "Who?"

*Id.* Rogers repeated his command, at which point Langston moved away

from Rogers and replied, "Nah." *Id.* Langston was holding his right arm

close to his body near his right jacket pocket, which led Rogers to

suspect that Langston was attempting to conceal a gun from him. *Id.*

Rogers repeated his commands at least two more times and Langston

continued to refuse. *Id.*

At the same time, Officer Theriault was approaching Langston

from the opposite direction. *Id.* Like Rogers, he noted that Langston

matched the description provided by the witnesses. *Id.* Based on his

observations, Theriault thought that Langston appeared agitated and

that the man he was speaking with was attempting to calm him down

or keep Langston out of the bar. *Id.* Theriault could not see Langston's

hands and believed they were in his jacket pockets, raising a concern

based on the information from dispatch that Langston might pull a weapon out. *Id.*

As Langston backed away from Officer Rogers, he turned and saw Officer Theriault. *Id.* Theriault grabbed Langston's right wrist and shoulder to prevent him from reaching for a weapon. Add. 17-18. Langston struggled to break free and pull away. Add. 18. Rogers also grabbed Langston, who continued to struggle. *Id.* Theriault dropped to the ground, bringing Langston down with him. *Id.* As he continued to resist their efforts to control him, the officers perceived Langston as attempting to bring his hands to the front of his body, where they believed a gun might be located. *Id.*

Officer Cannell then arrived to assist his colleagues as Langston continued to struggle. *Id.* Langston ignored orders from the officers to stop resisting, to put his hands behind his back, and to get on his stomach. *Id.* After approximately one minute, the three officers succeeded in wrestling Langston's arms behind his back and handcuffed him. *Id.* In the fracas, Officer Theriault slightly injured his knee. *Id.*

After restraining Langston, while still tangled with him on the ground, Theriault was able to see a pistol grip emerging from

Langston's right jacket pocket. *Id.* Officer Rogers also saw the weapon and seized it. *Id.*; RA 49. The weapon was loaded with a round in the chamber. *Id.* A further frisk of Langston's person resulted in the seizure of a second loaded magazine. Add. 18.

Langston was placed under arrest for Refusing to Submit to Arrest or Detention, in violation of 17-A M.R.S.A. § 751-B. Add. 19. He was subsequently charged by the State with Assault on an Officer, in violation of 17-A M.R.S.A. § 752-A(1)(A). SA 262, 273.

## 2. The District Court's Legal Analysis

The district court found that the police officers had reasonable suspicion to conduct an investigatory stop and frisk for weapons under *Terry v. Ohio*, 392 U.S. 1 (1968), based on all the information known to the officers at the time. Add. 26-27. It further held that the investigatory detention did not morph into a de facto arrest because the officers' actions were "proportionate and responsive" to the circumstances they faced in attempting to investigate Langston. Add. 28. Finally, it concluded that, even if the initial *Terry* stop was unlawful, Langston's refusal to comply with the officers' instructions and his use of physical force against them generated probable cause to

arrest him for Refusing to Submit to Arrest or Detention, rendering the subsequent search of his person lawful as a search incident to arrest. Add. 29.

### a.     A Lawful *Terry* Stop

As an initial matter, the district court found that Langston was not detained, for purposes of *Terry*, until Officer Theriault seized his wrist. Add. 20-21, citing *United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016). At that moment, the stop was justified based on "specific and articulable facts" known to the officers: (1) information received from witnesses; (2) their own observations of Langston's appearance and behavior; and (3) their experience in policing the Old Port neighborhood. Add. 21.

The officers had first-hand information from an identified tipster that a man matching Langston's appearance had punched another man earlier in the evening. Add. 22. The tipster's information held credibility because he provided identifying information, including his name, phone number, and address. *Id.* The fact that there had been a fight was corroborated by the bouncer at The Bar. Add. 23. The bouncer also predicted that if the two men met again, further violence could occur.

*Id.* Thus, the manager's subsequent report that one of the men had returned to the bar with a weapon had "credibility and urgency." *Id.* Furthermore, the manager's account was detailed and consistent with both other witnesses' information and the officers' own firsthand observations. *Id.* The officers were entitled to give "special weight" to information that "suggested an ongoing and imminent threat to public safety." Add. 24.

When the officers arrived, they noted that Langston's physical appearance and clothing matched the detailed descriptions provided by the tipster and manager. Add. 25. They thought that Langston appeared agitated and in a dispute with a man outside the bar, observations which the district court credited after reviewing video footage introduced at the suppression hearing.[5] *Id.* The video evidence supported Officer Rogers' testimony "that Langston's right arm was held in a position that would align with the presence of a weapon," lending further corroboration to the manager's allegation that Langston

---

[5]     The man with whom Langston was speaking testified that their interaction was "friendlier than it appeared." Add. 25 n.10. The officers, however, lacked any context and the court found "their impression of the scene they observed to have been objectively reasonable." *Id.*

possessed a gun. *Id*. The court also credited Theriault's testimony that, from his perspective, Langston's hands appeared to be in his pockets, which was consistent with the information the manager provided. *Id*. Combined with the information known to the officers, Langston's refusal to cooperate with Rogers's commands "undeniably and reasonably increased the level of suspicion . . . ." Add. 26. The officers' suspicions were also reasonably heightened by their experience in dealing with late-night disturbances in the Old Port. *Id*.

The totality of the foregoing circumstances, the court found, established reasonable suspicion "that Langston had punched another individual earlier in the night and was poised to menace this same individual with a firearm within the close confines of a crowded bar." *Id*. Therefore the investigatory stop was lawful. *Id*. Moreover, a frisk of Langston's person was justified for officer safety. Add. 26-27. The officers reasonably suspected that Langston had committed a violent offense earlier, which alone would support a frisk. Add. 26. The combination of facts known to the officers "independently provided . . . reasonable suspicion to believe that he was armed and posed a danger

to the safety of the officers themselves and the innocent bystanders in and around The Bar." Add. 27.

### b. Not a De Facto Arrest

The court rejected Langston's argument that the officers' actions constituted a de facto arrest. Add. 28-29. During a *Terry* stop, police officers may take measures "to protect themselves or others" as long as their actions are "proportionate to the perils associated with the particular circumstances." Add. 28, quoting *United States v. Rasberry*, 882 F.3d 241, 247 (1st Cir. 2018). The district court found that "the steps the officers took were proportionate and responsive to the circumstances that emerged during the stop." Add. 28. Each escalation was a reasonable response to Langston's conduct: when Langston failed to comply with Rogers's instructions to place his hands on his head, the officers were entitled to physically restrain him; when he pulled away from them and struggled, they were entitled to subdue him; when they perceived him to be reaching for the area where they suspected a gun was located, they were justified in handcuffing him. Add. 28-29. Thus, at no point during the initial detention was Langston under arrest. Add. 29.

### c. Search Alternatively Lawful as Incident to Arrest

Finally, the court found that, even if the *Terry* stop was unlawful at its inception, Langston's refusal to comply with the officers' directions and his use of physical force against them generated probable cause to arrest him for Refusing to Submit to Arrest or Detention. Add. 29. As such, the search of Langston after he was subdued was justified as incident to arrest. Add. 29-30 & n.14.

### B. Sentencing Proceedings

### 1. The Presentence Investigation Report

The United States Probation Office prepared a revised presentence investigation report ("PSR"), to which Langston raised no objections. D 87; SA 256-87. The PSR recommended a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) because Langston "possessed the firearm during felony Assault on an Officer," a violation of 17-A M.R.S.A. § 752-A(1)(A). SA 262.

The PSR also recommended that Langston receive three levels off for acceptance of responsibility, despite the fact that Langston "repeatedly violated the terms of pretrial supervision by using marijuana" and possessing it. SA 261-62. The probation officer also had

"significant concerns" regarding an incident in May 2022, in which Langston, while on supervision, had gone to a bar with friends and got into an altercation. SA 260, 262; GA 14-15. Langston threw the contents of his drink on another person and "went to punch someone but was stopped by one of his friends." SA 260. Langston denied consuming alcohol and claimed that all the drinks he purchased were consumed by his girlfriend. *Id.*

Langston's criminal history placed him in category VI. SA 270-71. His record reflects no fewer than five felony convictions, including robbery, drug offenses, and multiple felony theft convictions. SA 263-70. Langston also has been convicted of domestic violence assault and four instances of violating conditions of release. *Id.*

### 2. The Sentencing Hearing

Langston appeared before the district court for sentencing on March 30, 2023. D 99; RA 169-235. At the outset, the court confirmed that Langston had reviewed the PSR and had no objections to it. RA 171-172.

### a.  The Brook Casino Incident

The primary factual dispute at sentencing involved an incident that occurred on March 19-20, 2023, in which Langston was taken into protective custody in New Hampshire due to intoxication at The Brook casino in New Hampshire. RA 172-206. As part of his conditions of supervised release, Langston was prohibited from consuming alcohol and was required to inform his supervising officer "as soon as possible" of any contacts with law enforcement. D 18 at 2-3. Langston did not timely inform his probation officer regarding the incident and denied consuming any alcohol. GA 22-23; RA 288-289. The USPO therefore revised its recommendation and advised that Langston should not receive credit for acceptance of responsibility. *Id.*

The government introduced a series of exhibits to prove that Langston had, in fact, consumed alcohol. RA 172, 236-251; GA 1-23. According to the casino manager, he was called to the poker room at The Brook to resolve a dispute involving a customer, later identified as Langston, who was upset about a misdealt hand. RA 249. The manager noted that Langston "appeared intoxicated" and had "at least a few

instances where he was unsteady on his feet."[6] *Id.* Langston "became combative and agitated," causing a "huge disruption" and "disturbance." *Id.* The manager asked him to leave the poker room and "flagged down security." *Id.* At this point, Langston became "aggressive" and told the manager, "I'm getting my $200 back one way or another." *Id.* Casino staff asked Langston to leave "at least 10 times," but he refused. *Id.* At this point, a casino staffer called the police. *Id.*

According to the Seabrook (N.H.) Police Department report, officers were called to the Brook to assist with a customer who was "arguing with staff and would not leave." RA 238. The responding officer could "smell the alcohol coming from his person" and observed "it was clear that he just had too much to drink." *Id.* The customer refused to give the officers his full name or other identifying information. RA 238-239. "Due to his level of intoxication," the officers decided to place the man in protective custody and transport him to the police station.[7]

---

[6]     Using surveillance footage, casino employees subsequently determined that Langston had been served nine alcoholic beverages, one soda, and one meal during the approximately 13 hours that he spent in the poker room. RA 246-248, 251.

[7]     The government also introduced video footage from inside the police cruiser, in which Langston can be seen "singing," "acting

Once there, officers identified the man as Langston using a driver's license found on the back of his cell phone. RA 239.

At sentencing, Langston challenged the admission of the Seabrook Police Department report, arguing that the information therein was unreliable hearsay. RA 172. The district court rejected this claim, finding "sufficient indicia of reliability to support its probable accuracy." RA 173. Langston also objected to the casino employees' written reports because they did not contain first-hand knowledge that Langston consumed alcohol. RA 174, 176. Defense counsel further argued that the government had not proven that Langston had consumed alcohol or was intoxicated. No witness personally observed Langston drink alcohol at the casino and his behavior in the police cruiser "demonstrate[d] a mentally ill individual" who was merely upset that he had wrongly been taken into custody. RA 193.

The district court found to the contrary. RA 200. Based on the evidence before it, and his prior interactions with Langston during court proceedings, the court had "no question . . . that he was inebriated,

---

erratically," and otherwise exhibiting signs of intoxication. RA 188; GA 16.

absolutely no question he was inebriated." *Id.* Langston "acted so different than he [had at] any other time." *Id.* "He was singing to himself, he was groggy, his voice sounded inebriated." *Id.* The court also credited the police report, noting "there was absolutely no reason for the police officer to mistake inebriation in this case." *Id.* In short, the court found "to a preponderance that he had been drinking and he was inebriated." *Id.*

### b. Acceptance of Responsibility

In light of Langston's behavior at the casino, the court denied acceptance of responsibility. RA 205-06. His conduct, mere days before sentencing, bore a great similarity to the offense of conviction, which "involved drinking at a bar, not cooperating with the police," and the other incident while on supervision, in which Langston got into another altercation at a bar. RA 205. Drinking was a violation of his release conditions and his refusal to provide his name to the police officers showed that "he was toying with the police." *Id.* The court viewed his comment to the casino manager about getting his money back "one way or another," as a "threat." RA 206. Moreover, Langston failed to report the police contact to his supervising officer in a timely manner. *Id.*

"Coupled with the original offense," the court stated, "it appears to me he hasn't learned much. And I find there's no acceptance of responsibility." *Id.*

### c.      The Guidelines Calculation and Sentence

The court heard statements from character witnesses, arguments from counsel, and allocution by Langston. RA 206-229. It then adopted the facts set forth in the PSR. RA 229. The court determined that Langston possessed the gun in connection with his assault on an officer, resulting in a four-level enhancement to his advisory guidelines range. *Id.* Without credit for acceptance of responsibility, Langston's sentencing range was 57-71 months. *Id.* Neither party objected to the court's guidelines calculations. RA 229-230. The court then imposed a low-end guidelines sentence of 57 months' incarceration. RA 231.

## SUMMARY OF THE ARGUMENTS

When two members of the Portland Police Department approached appellant Carl Langston outside a bar late at night, after having received reports that a man matching his description had brawled with another bar patron earlier that night and had now returned to the bar with a gun, they were entitled to act with urgency to ensure the public's safety. When Langston refused their commands to place his hands on his head and held his hands near where the officers suspected the gun was located, they had ample reasonable suspicion to investigate further and frisk him for safety reasons.

Langston scuffled with the police officers when they sought to detain him, during which one of the officers injured his knee. Langston was charged by the state with felony Assault on an Officer. The district court did not plainly err when it imposed, without objection, a four-level guidelines enhancement because Langston possessed a firearm in connection with the felony assault.

While on supervised release, Langston went to a casino in New Hampshire. According to casino employees, while there, Langston was served nine alcoholic beverages. A casino manager described Langston

as "combative and agitated," and that he appeared intoxicated. The responding police officer also perceived Langston to be inebriated. Based on the witness reports and the district court's personal review of related video, the district court reasonably found that Langston violated his release conditions by drinking alcohol and failing to notify his probation officer of his contact with police. It was not an abuse of discretion for the district court to deny Langston acceptance of responsibility credit based on his repeated misconduct while on release.

Finally, Langston contends that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him, relying on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). This unpreserved claim fails under plain error review. Controlling Supreme Court and First Circuit authority confirms that felon dispossession statutes are constitutional. Even if *Bruen* portends a future change in the scope of § 922(g)(1), Langston cannot show plain error due to the lack of controlling authority. Nor can Langston show prejudice, given his numerous felony convictions, including one for robbery, and his personal history of violent conduct. This Court should affirm Langston's conviction and sentence.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY FOUND THAT THE OFFICERS HAD REASONABLE SUSPICION TO DETAIN LANGSTON BASED ON WITNESS REPORTS, THEIR OWN OBSERVATIONS, AND LANGSTON'S BEHAVIOR. (Appellant's Issue 2)

Langston contends that the Portland police officers who detained him outside of The Bar lacked reasonable articulable suspicion to do so, or unlawfully arrested him, requiring suppression of the firearm and ammunition found on his person. This argument ignores parts of the factual record, lacks persuasive force, and should be rejected by this Court.

### A. Standard of Review

In reviewing the denial of a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions, including whether to grant or deny the motion to suppress, de novo. *United States v. Rodríguez-Pacheco*, 948 F.3d 1, 6 (1st Cir. 2020). Factual findings will be overturned "only if, after reviewing all of the evidence," the Court has "a definite and firm conviction that a mistake has been committed." *United States v. Ivery*, 427 F.3d 69, 72 (1st Cir. 2005) (internal quotation marks and citation omitted). The

Court is "especially deferential" to the district court's determinations regarding witness credibility. *United States v. Sierra-Ayala*, 39 F.4th 1, 13 (1st Cir. 2022). The denial of a motion to suppress will be affirmed "if any reasonable view of the evidence supports it." *United States v. Rivera-Rivera*, 555 F.3d 277, 283 (1st Cir. 2009).

## B. Discussion

The district court correctly concluded that Officers Rogers and Theriault had reasonable suspicion to detain and investigate Langston at the time they seized him outside The Bar. Under *Terry v. Ohio*, 392 U.S. 1 (1968), a law enforcement officer may detain a person for further investigation when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* at 30; *see also Arizona v. Johnson*, 555 U.S. 323, 323 (2009) (officer may briefly detain an individual for questioning if officer "reasonably suspects that the person apprehended is committing or has committed a crime."). Conducting a *Terry* stop requires a "particularized and objective basis" for the officer's suspicions of criminal activity, *United States v. Cortez*, 449 U.S. 411, 417-18 (1981), "grounded in specific and articulable facts." *United States v. Hensley*, 469 U.S. 221,

229 (1985). A *Terry* stop must be "'justified at [its] inception' and reasonable in scope, accounting for the 'emerging tableau' of information known to the detaining officer." [8] *United States v. Arthur*, 764 F.3d 92, 97 (1st Cir. 2014) (quoting *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). Reasonable suspicion is assessed based on "the totality of the circumstances." *United States v. Jones*, 432 F.3d 34, 40 (1st Cir. 2005).

The district court's factual findings below amply support its conclusion that the police officers had reasonable articulable suspicion to seize Langston. As the district court noted, substantial information supported the officers' decision to detain Langston. First, multiple witness reports provided credible and mutually corroborative information that a man matching Langston's description had been involved in a violent assault a short time before and now possessed a

---

[8] Langston appears only to challenge the validity of his detention at the moment he was seized, not the reasonableness of the police officers' actions thereafter. D.Br. at 26 ("Officers lacked reasonable suspicion … when they tackled him"), 29 ("totality of the circumstances did not give rise to reasonable suspicion . . . when police encountered him"). Therefore, any argument regarding the scope of the stop has been waived. *United States v. Mayendía-Blanco*, 905 F.3d 26, 32 (1st Cir. 2018) ("arguments not raised by a party in its opening brief are waived").

firearm. *See Arthur*, 764 F.3d at 97 (corroborating witness information can support reasonable suspicion). The first tipster described a unique embroidered hat worn by the assailant, his general physical characteristics, and his role as the aggressor in a fight that occurred outside The Bar. The bouncer confirmed that a fight had occurred and predicted no further trouble unless the men ran into each other again. The original tipster, this time providing identifying information, called again to relay that the brawler had returned to The Bar. And finally, the establishment's manager called to report that the bouncer told him that the man previously involved in the fight had returned with a gun. The manager also provided a description of the jacket and hoodie worn by the suspect.

Armed with that information, the officers were well within their right to seek to question Langston when they observed him in an apparent dispute with another person outside The Bar minutes later. Langston was wearing a hat with embroidered horns, as described by the tipster, and a maroon jacket and gray hoodie, as described by the manager. Given the "special weight" which may be accorded to reports of a public safety risk, the officers likely had reasonable suspicion to

detain Langston for investigation based on this information alone. *United States v. Monteiro*, 447 F.3d 39, 49 (1st Cir. 2006); *see also United States v. Ruidiaz*, 529 F.3d 25, 31 n.2 (1st Cir. 2008).

Second, the officers reasonably relied on their own observations of and interactions with Langston. Not only did Langston's physical appearance match that described by the witnesses, but he was non-compliant with requests to place his hands on his head and was holding his right arm in a manner that suggested to Officer Rogers he was concealing a firearm. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("nervous, evasive behavior" may provide reasonable suspicion justifying an investigatory stop). Langston's actions suggested a real and immediate safety risk to the officers and any bystanders. *United States v. Brake*, 666 F.3d 800, 805 (1st Cir. 2011) ("potentially fatal situation" justified stop and frisk). Moreover, the officers' experience in dealing with late night disturbances in the Old Port reasonably added to their urgency in investigating Langston. *United States v. Wright*, 485 F.3d 45, 54 (1st Cir. 2007).

Langston does not challenge any of the district court's factual findings, but rather seeks to undermine the reliability of the

information provided by the witnesses and the lack of investigation conducted by the officers. D.Br. at 28-31. For example, he suggests that the tipster's original call is irrelevant to the reasonable suspicion analysis because the officers "were not investigating the scuffle" when they returned to The Bar the second time. D.Br. at 29. This, however, is wrong on two levels. First, Langston cites nothing in the record indicating that the police were not simultaneously investigating both the prior altercation and the new report of a firearm. Certainly, law enforcement officers are entitled to conduct *Terry* stops to investigate past criminal activity, not merely to engage in prophylactic efforts at crime prevention. *United States v. Camacho*, 661 F.3d 718, 726 (1st Cir. 2011). The case law is replete with instances of investigatory stops undertaken based on reports of completed criminal conduct. *See*, *e.g.*, *United States v. Stroman*, 500 F.3d 61, 64 (1st Cir. 2007) (*Terry* stop and frisk justified to investigate report of earlier attempted break-in). Second, even setting aside any investigation into the earlier fight, the information regarding the suspect's appearance and his prior violent actions remain relevant to the officers' determination that reasonable, particularized suspicion existed with respect to Langston.

Similarly, Langston argues that the manager's report that a patron had a gun cannot supply reasonable suspicion because he did not have first-hand knowledge and gun possession is not itself a crime. D.Br. at 30. The reasonable suspicion analysis, however, requires consideration of the totality of the circumstances, not each fact in isolation. *See United States v. Qin*, 57 F.4th 343, 349 (1st Cir. 2023) (citing cases). Here, the manager's third-hand information was bolstered not only by other witness reports but also by the police officer's personal observations of Langston's conduct as they attempted to engage with him. Moreover, while mere gun possession is not a crime, information that Langston was looking for the man with whom he previously brawled reasonably led the officers to conclude that any number of offenses that can involve a firearm might occur without their immediate intervention.

In short, the constellation of facts known to the officers was more than "sufficient to trigger a reasonable suspicion that some criminal activity was afoot – and that the defendant was involved." *Ruidiaz*, 529 F.3d at 30. The district court did not err in finding Langston's detention

to be supported by reasonable suspicion at the time he was seized. This Court should affirm the denial of the motion to suppress.

## II. THE DISTRICT COURT DID NOT PLAINLY ERR IN FINDING LANGSTON POSSESSED A FIREARM IN CONNECTION WITH ANOTHER FELONY. (Appellant's Issue 3)

At sentencing, the district court enhanced Langston's advisory guidelines range by four levels, finding that he possessed the gun in connection with another felony, namely, assault on an officer in violation of 17-A M.R.S.A. § 752-A(1)(A). Though he raised no such challenge below, Langston now claims that the district court's finding was plainly erroneous. This Court should reject Langston's claim as waived or find that there was no error, much less plain error, by the district court.

### A. Standard of Review

Before the district court, Langston did not dispute the PSR's recommendation, nor the district court's finding, that he possessed a firearm in connection with a felony assault on a police officer. When "a party fails to raise a theory at the district court level, that theory is generally regarded as forfeited and cannot be advanced on appeal." *United States v. Torres*, 162 F.3d 6, 11 (1st Cir. 1998); *see also United*

*States v. Dietz*, 950 F.2d 50, 55 (1st Cir. 1991) ("arguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue"); *United States v. Casey*, 825 F.3d 1, 21 (1st Cir. 2016) (rejecting as "waived" new basis for suppression not argued below).

"[N]ew arguments, raised for the first time on appeal," if considered at all, are reviewed "for plain error only." *United States v. Caparotta*, 676 F.3d 213, 218 (1st Cir. 2012). Under that demanding standard, an appellant must establish: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Madsen*, 809 F.3d 712, 717 (1st Cir. 2016) (internal quotation marks omitted). "The appellant must carry the devoir of persuasion as to each of those four elements." *United States v. Padilla*, 415 F.3d 211, 218 (1st Cir. 2005).

## B.    Discussion

Langston contends that the district court plainly erred in applying a four-level enhancement because he possessed a firearm in connection

with an assault on a law enforcement officer, specifically the skirmish outside The Bar when Officers Rogers and Theriault attempted to detain him. Because he was initially arrested for refusing to submit to arrest or detention, a misdemeanor, Langston contends the enhancement was improper. D.Br. at 32-37.

### 1. Langston waived this claim.

As an initial matter, this Court should treat Langston's claim as waived. In most cases, when a defendant attempts to press on appeal a claim not advanced below, this Court applies plain error review to the forfeited claim, unless the record evinces the defendant's "intention to forgo a known right." *United States v. Eisom*, 585 F.3d 552, 556 (1st Cir. 2009); *see also United States v. Brake*, 904 F.3d 97, 99 (1st Cir. 2018) ("Waiver refers to the intentional relinquishment or abandonment of a known right. By contrast, forfeiture refers not to affirmative conduct but rather to a failure to make the timely assertion of a right.") (internal quotation marks and citations omitted).

This Court has noted, however, that a "powerful case for waiver" exists when a defendant "eschews a warrantable objection to a conclusion reached in a presentence report" because doing so "lulls both

the prosecution and the sentencing court into what will prove to be a false sense of security if he is later allowed to do an about-face." *United States v. Turbides–Leonardo*, 468 F.3d 34, 38 (1st Cir. 2006). Here, Langston failed to object to the draft PSR; when asked by the district court at sentencing, he affirmed that he had no objections to the revised PSR; and he raised no objection when the court calculated his guidelines range, including the enhancement. The repeated failure to object suggests that this was not a mere oversight by counsel, but rather a considered choice. Moreover, Langston's failure to raise the claim below deprived the government of the opportunity to build a stronger factual record to support the enhancement, beyond the information set forth in the PSR. Had it been aware that the matter was in dispute, the government could have introduced additional records and testimony to assist the district court in rendering its decision. Langston should not now be rewarded for his preterition.

### 2. There was no error, much less plain error, by the district court.

Should the Court overlook Langston's waiver, he cannot overcome even the first hurdle of plain error review. The district court properly found that Langston possessed the gun in connection with a felony

assault on a police officer. Langston's suggestion that the only arrestable offense he committed was resisting arrest is without merit. D.Br. at 33. Langston was, in fact, charged with Assault on an Officer in state court for his actions during the encounter with Officers Rogers and Theriault.[9] SA 273. The PSR's description of the offense conduct describes a "physical struggle" between Langston and the officers, resulting in an injury to one officer's knee. SA 260. During the struggle, Langston "was moving his hands towards his sweatshirt pocket," where the gun was located. *Id.* In the absence of any dispute from Langston, the district court was entitled to rely on these facts to find that the "in connection with" enhancement was appropriate. *United States v. González*, 857 F.3d 46, 61-62 (1st Cir. 2017).

Nor does Langston's self-serving description of the melee between him and the officers suffice to establish error. To commit the offense of Assault on an Officer under Maine law, a defendant must "intentionally, knowingly or recklessly" cause "bodily injury to a law enforcement officer while the officer is in the performance of his official

---

[9]     That charge, and others relating to the incident, were dismissed in lieu of federal prosecution. SA 273.

duties." 17-A M.R.S.A. § 752-A(1)(A). Langston suggests two reasons why he did not commit assault: first, he did not know he was fighting with police officers because Theriault approached him from behind; and second, he did not cause Theriault's injury because it occurred when Theriault pulled him to the ground. D.Br. at 34-35. Neither argument holds water.

As to the first, there can be no question that Langston was aware that he was fighting with police officers. He observed Officer Rogers approaching him and refused Rogers's command to place his hands on his head. The district court found that, as he backpedaled, "Langston turned around and discovered a second officer on the scene," whereupon "Theriault immediately grabbed Langston's right wrist and shoulder in order to deny him the opportunity to reach for a weapon." Add. 17-18. During the struggle, the officers were issuing commands to Langston to stop resisting and put his hands behind his back. Add 18. It was only after Langston physically resisted the officers that Theriault dragged him to the ground, injuring his knee in the process. RA 109. Thus, even if Langston did not initiate the movement that resulted in the injury, it

was Langston's decision to physically resist detention that recklessly caused Theriault's injury.

To the extent that the factual basis for the enhancement is close at all (and the government believes it is not), a disputable factual finding by the district court does not constitute "clear or obvious" error. *Madsen*, 809 F.3d at 717. This Court not only accepts "a district court's findings of fact (unless clearly erroneous), but also to give due deference to the district court's application of the Guidelines to the facts." *United States v. Andino-Morales*, 73 F.4th 24, 43 (1st Cir. 2023) (internal quotation marks and citation omitted). Here, applying appropriate deference, any error by the district court in concluding that the facts supported application of the enhancement was not plain.[10]

---

[10]     Should the Court find clear or obvious error in the district court's application of the guidelines enhancement, the government concedes that such error would satisfy the third and fourth prongs of plain error review. *Rosales-Mireles v. United States*, 585 U.S. 129 (2018).

## III. THE DISTRICT COURT SUPPORTABLY FOUND THAT LANGSTON CONSUMED ALCOHOL IN VIOLATION OF HIS PRETRIAL RELEASE CONDITIONS AND APPROPRIATELY DENIED HIM ACCEPTANCE OF RESPONSIBILITY. (Appellant's Issues 4 and 5)

Langston makes two claims of sentencing error. He alleges that the district court erred in relying on certain hearsay evidence to find that Langston was drinking at The Brook casino, in violation of his conditions of pretrial release. D.Br. at 42-50. The district court compounded its error, in Langston's view, by denying him credit for acceptance of responsibility due, in part, to the incident at The Brook. D.Br. at 37-42. Both claims lack merit. The district court made supportable factual findings as to both the reliability of the hearsay evidence and Langston's failure to accept responsibility for his criminal conduct, which are entitled to deference from this Court.

### A. Standard of Review

This Court reviews "preserved challenges to a sentencing's procedural reasonableness under a multifaceted abuse-of-discretion standard," in which it applies "de novo review to the sentencing court's interpretation and application of the sentencing guidelines, assay[s] the court's factfinding for clear error, and evaluate[s] its judgment calls for

abuse of discretion." *United States v. Lilly*, 65 F.4th 38, 41 (1st Cir. 2023) (internal quotation marks and citations omitted).

One such procedural error is "selecting a sentence based on clearly erroneous facts, such as where factual findings are based solely on unreliable evidence and therefore cannot be established by a preponderance of the evidence, as they must." *United States v. Rivera-Ruiz*, 43 F.4th 172, 181 (1st Cir. 2022) (cleaned up). A "sentencing court's factbound determination that a defendant has not accepted responsibility" is reviewed only for clear error. *United States v. Jordan*, 549 F.3d 57, 60 (1st Cir. 2008); *see also United States v. Garrasteguy*, 559 F.3d 34, 38 (1st Cir. 2009).

## B. Discussion

### 1. The district court reasonably found the written statements of law enforcement and casino employees to be sufficiently reliable for purposes of sentencing.

Over Langston's objection, the district court admitted a written police report describing the Seabrook (N.H.) Police Department's interactions with Langston on March 19-20, 2023, as well as written statements from two casino employees regarding Langston's alcohol consumption while at The Brook. RA 172-174, 236-251. Contrary to

Langston's contentions, the district court did not abuse its "broad discretion" in admitting the statements, nor make clearly erroneous factual findings based thereon. *United States v. Rodriguez*, 336 F.3d 67, 71 (1st Cir. 2003).

At sentencing, the district court has "broad discretion to accept hearsay evidence . . . so long as the court supportably concludes that the information has sufficient indicia of trustworthiness to warrant a finding of probable accuracy." *Id.* at 71; *United States v. Aymelek*, 926 F.2d 64, 68 (1st Cir. 1991) (noting "well-established doctrine that a sentencing court may rest upon hearsay evidence so long as it appears reliable"); *see also* U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

This Court has described a multitude of ways in which hearsay statements may be deemed reliable. *See United States v. Colón-Maldonado*, 953 F.3d 1, 11 (1st Cir. 2020) (providing examples). Here, a

variety of related evidence provided support for the reliability of the contested statements.

First, the written statements were consistent with each other, providing mutual corroboration with respect to Langston's intoxication. *See United States v. Mills*, 710 F.3d 5, 16 (1st Cir. 2013) (statements reliable where "sufficiently detailed, internally consistent, mutually corroborative, and compatible with other information"). Both the police report and the casino manager described Langston's agitation over a misdealt hand of poker. RA 238, 249. The Seabrook police officer "could smell the alcohol coming from his person" and observed that "it was clear he just had too much to drink." RA 238. The casino manager described Langston as "very confused," and noted "a few instances where he was unsteady on his feet." RA 249. Based on his interactions with Langston, the casino manager thought that he "appeared intoxicated." *Id*. In the third disputed exhibit, the director of casino operations stated that, based on surveillance footage he reviewed, Langston was served nine alcoholic drinks, one soda, and one order of food during the more than 12 hours he sat in the poker room. RA 251.

This document provided further support for the personal observations of intoxication made by the police officer and casino manager.

Second, each statement was highly detailed, lending to its credibility. *Rodriguez*, 336 F.3d at 70-72 (hearsay statement reliable where "replete with details"). The police report described Langston's agitation over a misdealt poker hand, his refusal to provide identifying information, his tendency to make "a smart remark" instead of answering the officer's questions, and his repetitive questioning of the officer without listening to the answer. RA 238-240. The casino manager recounted his interactions with Langston and the efforts he undertook to investigate Langston's concerns regarding the misdeal. RA 249. He described Langston as "combative and agitated," and causing a "huge disruption" in the poker room. *Id.* The manager asked Langston to leave numerous times before calling the police. *Id.* The final exhibit provided specific times that Langston was served drinks and by whom. The extent of the detail provided in these statements fully supported the district court's conclusion that they were reliable.

Third, the exhibits were corroborated by other, independent evidence. The government introduced screen shots from surveillance

footage to show the instances in which Langston was served an alcoholic beverage. RA 246-248; GA 4-13. The alcoholic beverages were served "in a clear cup," while the soda came in "a paper cup or larger kind of . . . cup that had some blue on it." RA 175. The difference between the types of containers used for alcoholic versus non-alcoholic drinks supports the casino employee's assessment of the number of alcoholic beverages served to Langston. Moreover, the surveillance video from inside the police cruiser while Langston was en route to jail corroborates the officer's assessment that he was intoxicated. GA 16. Langston was singing, acting erratically, and otherwise behaving in a manner consistent with intoxication. RA 176, 188.

Fourth, the statements were provided by individuals who had professional experience with respect to the information provided. Police officers and casino managers are often required to interact with intoxicated individuals, lending credibility to their assessment of Langston's mental state. As the district court reasonably noted, "there was absolutely no reason for the police officer to mistake inebriation in this case." RA 200. The same is true of the casino manager. And the director of casino operations, who identified certain beverages served to

Langston as alcoholic, would certainly be familiar with the types of

containers utilized by the food and beverage team and be able to

distinguish alcoholic from non-alcoholic drinks.

Finally, the district court was able to assess the reliability of the

statements based on his own experience and interactions with Langston

during court proceedings. *Id.* The court, familiar with Langston's

normal tone of voice, reviewed the video evidence and found that there

was "absolutely no question he was inebriated" because Langston "acted

so different than he has any other time." *Id.* "He was singing to himself,

he was groggy, his voice sounded inebriated." *Id.* The district court's

personal familiarity with Langston, together with the other indicia of

reliability described above, allowed it to reasonably conclude that the

hearsay statements were sufficiently reliable for use at sentencing.

*United States v. Acevedo-López*, 873 F.3d 330, 340 (1st Cir. 2017).

Indeed, to the extent the district court erred in admitting the

disputed hearsay statements or in relying on them to find that

Langston violated his release conditions by consuming alcohol, such

error was harmless because the record indicates that the district court

would have reached the same conclusion based on the surveillance video

(which was not objected to) and his personal experience with Langston in a sober state. "[R]emand is required only if the sentence was imposed *as a result of*" the error. *Williams v. United States*, 503 U.S. 193, 202 (1992) (internal quotation marks omitted) (emphasis in original). "If 'the district court would have imposed the same sentence' even without the error, it was harmless." *United States v. Tavares*, 705 F.3d 4, 25 (1st Cir. 2013) (quoting *Williams*, 503 U.S. at 202-03). Here, the record indicates that the district court would have found Langston to be intoxicated even if it had excluded the disputed exhibits.

> ## 2. The district court reasonably denied Langston acceptance of responsibility credit based on his misconduct while on pretrial release.

Section 3E1.1(a) of the guidelines offers a two-point reduction in offense level if the defendant "clearly demonstrates acceptance of responsibility for his offense." *Jordan,* 549 F.3d at 60. As noted above, a "sentencing court's factbound determination that a defendant has not accepted responsibility" is reviewed only for clear error. *Id.* Substantial deference is paid to the district court's factual findings, in recognition of "the special difficulty of discerning, on a cold record, whether a

defendant's expressions of remorse were in earnest." *United States v. Deppe*, 509 F.3d 54, 60 (1st Cir. 2007).

Entering a guilty plea does not entitle a defendant to the acceptance-of-responsibility adjustment. *United States v. deJesús*, 6 F.4th 141, 148 (1st Cir. 2021). It is the defendant's burden to prove that he has accepted responsibility and is entitled to the guidelines reduction. *Deppe*, 509 F.3d at 60. To earn a § 3E1.1 reduction, a defendant "must demonstrate that he has taken full responsibility for his actions, and he must do so candidly and with genuine contrition." *United States v. Saxena*, 229 F.3d 1, 9 (1st Cir. 2000); *see also United States v. Royer*, 895 F.2d 28, 30 (1st Cir. 1990) ("acceptance of responsibility necessitates candor and authentic remorse – not merely a pat recital of the vocabulary of contrition").

Among the non-exhaustive list of factors a sentencing court may consider in assessing acceptance of responsibility is whether the defendant has voluntarily terminated or withdrawn "from criminal conduct or associations." U.S.S.G. § 3E1.1, cmt. n.1(B). A defendant's conduct while on pretrial release is plainly relevant to the district court's assessment of his contrition. *United States v. McLaughlin*, 378

F.3d 35, 41 (1st Cir. 2004). Criminal conduct, even a "low-level misdemeanor," can be "probative of the authenticity of a defendant's acceptance of responsibility." *United States v. McCarthy*, 32 F.4th 59, 64 (1st Cir. 2022).

In this case, Langston, on multiple occasions, engaged in conduct that was criminal in nature and a violation of his conditions of release. First, Langston repeatedly tested positive for marijuana during urinalysis screenings, and, on one occasion, his supervising officer located marijuana in his kitchen and bedroom. SA 259. Langston's possession and use of marijuana violated both his release conditions and federal law. D 18 at 2; 21 U.S.C. § 844. Second, while at a bar with friends, Langston threw his drink on another patron and had to be restrained from punching him. SA 260. Even though no charges were filed, Langston's conduct constituted assault under Maine law. 17-A M.R.S.A. § 207(1)(A) (causing "offensive physical contact"); *State v. Filler*, 3 A.3d 365, 373 (Me. 2010) (elements for assault "satisfied" where defendant "threw two cups of water in [the victim's] face."). Third, he was issued a criminal trespass notice by The Brook casino

after he ignored repeated instructions from casino staff to leave the premises.[11] GA 1.

Langston contends that his pretrial release violations were "isolated and technical in nature." D.Br. at 41. But that understates the alarming nature of his misconduct. Indeed, "post-offense conduct may be highly relevant to whether a defendant sincerely accepted responsibility for his crime if it involves a 'high degree of insensitivity to the root causes' of the defendant's original offense." *McCarthy*, 32 F.4th at 64 (quoting *Saxena*, 229 F.3d at 10). Both the incident at the bar and his conduct at the casino were highly reminiscent of the behavior that led to the underlying charge in this case. All three events involved Langston's inability to control his anger. The underlying offense and

---

[11] Even had Langston's conduct not risen to the level of a criminal offense, his repeated disregard for the conditions of release to which he agreed bespeak a lack of contrition and constitute a "breach of trust" with the court that justifies denial of an acceptance-of-responsibility adjustment. *deJesús*, 6 F.4th at 148. Langston cites no authority for the proposition that repeated violations of release conditions cannot form the basis for denial of a §3E1.1 adjustment. Given that the Guidelines Manual describes the examples it provides as non-exhaustive, and coupled with the broad discretion afforded the sentencing court with respect to acceptance of responsibility, the government contends that Langston's repeated noncompliance with his release conditions could, alone, support the district court's ruling.

Langston's actions at the casino were prompted in part by alcohol consumption. The district court found that Langston refused to provide his name to the police at the casino and threatened the casino manager, reflecting the same non-compliance and aggression that led to his scuffle with the Portland Police Department. RA 205-206. Under these circumstances, the district court did not clearly err in finding that Langston had not genuinely accepted responsibility for his prior criminal conduct.

## IV. ON PLAIN ERROR REVIEW, 18 U.S.C. § 922(g)(1) REMAINS CONSTITUTIONAL AS APPLIED TO LANGSTON, A FIVE-TIME FELON PREVIOUSLY CONVICTED OF ROBBERY AND DRUG TRAFFICKING. (Appellant's Issue 1)

Langston raises an unpreserved challenge to the constitutionality of 18 U.S.C. § 922(g)(1), arguing that the statute violates the Second Amendment as applied to him. D.Br. at 21. Specifically, he contends that his prior felony convictions were nonviolent and that no "historical tradition" of firearms regulation supports gun ownership prohibitions for offenders like him. D.Br. at 21-24. Langston's contentions are not supported by fact or law. This Court should affirm his conviction.

## A. Standard of Review

Generally, this Court reviews the constitutionality of a statute de novo. *United States v. Volungus*, 595 F.3d 1, 4 (1st Cir. 2010). However, where the appellant has failed to preserve his claim below, this Court reviews only for plain error. *See United States v. Ortíz-Mercado*, 919 F.3d 686, 689 (1st Cir. 2019). In order to establish plain error, a defendant must show that: "(1) there was error; (2) the error was plain; (3) the error affected [his] substantial rights; and (4) the error adversely impacted the fairness, integrity, or public reputation of judicial proceedings." *United States v. Clemens*, 738 F.3d 1, 10 (1st Cir. 2013) (alteration in original) (internal quotation marks and citation omitted). Plain error is a "high hurdle," requiring demonstration both "that an error occurred and that it was clear or obvious." *United States v. Diaz*, 285 F.3d 92, 95-96 (1st Cir. 2002). Here, as Langston concedes, he failed to challenge the constitutionality of § 922(g)(1) before the district court and plain error review applies. D.Br. at 20.

## B. Section 922(g)(1) is Constitutional Under the Precedents of Both the Supreme Court and this Court

Federal law has long restricted the shipment, transport, possession, and receipt of firearms and ammunition by certain

categories of individuals. One such disqualification is 18 U.S.C. § 922(g)(1), which generally prohibits the possession of firearms by any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." Section 922(g)(1) reflects Congress's longstanding recognition that the "ease with which" firearms could otherwise be acquired by "criminals[] . . . and others whose possession of firearms is similarly contrary to the public interest" is "a matter of serious national concern." S. Rep. No. 90-1097, at 2114 (1968).

In a series of cases, beginning with *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and most recently in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court has sought to clarify the interplay between firearms regulations and the Second Amendment. The *Heller* line of cases, as well as binding First Circuit precedent, conclusively demonstrate the fallacy of Langston's constitutional claim.

**1.    The Supreme Court held in *Heller* that the Second Amendment protects an individual right of law-abiding citizens.**

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court concluded, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. at 595. The Court made clear, however, that "the right secured by the Second Amendment is not unlimited." *Id.* at 626; *cf. id.* at 635 (noting by way of analogy that certain types of speech, including "obscenity, libel, and disclosure of state secrets," fall outside the scope of the First Amendment's free-speech clause). With respect to the Second Amendment, the Court identified the right to keep and bear arms as belonging to "law-abiding, responsible citizens." *Id.* at 635. And consistent with that understanding, the Court specifically stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which the Court deemed "presumptively lawful." *Id.* at 626 & n.26. Indeed, the Court stated that Heller—the plaintiff in that case—would be entitled to keep a handgun in his home "assuming" that he is "not disqualified from the exercise of Second Amendment rights." *Id.* at 635; *see also id.* at 631 (noting the assumption that Heller was "not a felon").

Two years later, in *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" the "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

### 2. Following *Heller*, this Court has upheld the constitutionality of § 922(g)(1)

Following *Heller* and *McDonald*, this Court upheld the constitutionally of § 922(g)(1). In *United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011), this Court considered – and rejected – an as-applied challenge to § 922(g)(1). 658 F.3d at 112-113. In that case, the defendant claimed that his prior felony convictions were non-violent, rendering § 922(g)(1) unconstitutional as to him. *Id.* at 113. This Court found that neither *Heller* nor *McDonald* "cast doubt on such longstanding regulatory measures as prohibition on the possession of firearms by felons." *Id.* at 112-113; *see also United States v. Booker*, 644 F.3d 12, 22-23 (1st Cir. 2011) (upholding Section 922(g)(9) against constitutional challenge as "fit[ting] comfortably among the categories of regulations that *Heller* suggested would be 'presumptively lawful'").

This Court observed in *Torres-Rosario*, "[i]t is well-established that felons are more likely to commit violent crimes than are other law-abiding citizens." 658 F.3d at 113 (quoting *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011)). The *Torres-Rosario* panel did note that the "presumptively lawful" language in *Heller* suggested that "the Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban," or even be willing to consider "highly fact-specific objections." *Id.* Nevertheless, this Court concluded that Torres-Rosario's prior conviction for drug trafficking was not "so tame and technical" that § 922(g)(1)'s rule of categorical dispossession might not apply. *Id.* Moreover, it cautioned that taking a fact-specific approach to firearms rights "would obviously present serious problems of administration, consistency and fair warning." *Id.*; *see also Booker*, 644 F.3d at 23 ("the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis") (internal citation omitted).

### 3.   *Bruen* does not undermine *Torres-Rosario*

In 2022, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, which invalidated New York's "may-issue" firearms licensing routine as unconstitutional. 597 U.S. at 79 (Kavanaugh, J., joined by Roberts, C.J., concurring). In doing so, it approved "shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id.* at 38 n.9; s*ee id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring). The Court explained that such regimes—many of which prohibit the issuance of licenses to felons—generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id.* at 38 n.9 (majority op.) (quoting *Heller*, 554 U.S. at 635).

Thus, *Bruen* reaffirms *Heller* and *McDonald*'s recognition that the right to bear arms is limited to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. Indeed, *Bruen* defines the Second Amendment right as belonging to "law-abiding" citizens no fewer than fourteen times. 597 U.S. at 8, 15, 26, 29-33, 33 n.8, 38 & n.9, 60, 70. The *Bruen* Court stressed that it was "reiterat[ing]" *Heller*'s approach, clarifying

the legal standard "[i]n keeping with *Heller*," and "apply[ing]" the "test that [the Court] set forth in *Heller*." 597 U.S. at 17, 24, 26. Several Justices wrote separately to emphasize that felon dispossession laws remained valid. *See id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional); *id.* at 72 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)).[12]

*Bruen* did abrogate a separate aspect of the Second Amendment precedent from several circuits that has no bearing on the issue here.

---

[12]     In total, eight members of the *Bruen* Court have joined at least one opinion expressly approving of *Heller*'s and *McDonald*'s reassurances regarding felon-dispossession statutes. The three dissenting justices agreed with Justice Kavanaugh's concurring opinion: "I understand the Court's opinion today to cast no doubt on [the] aspect of *Heller*'s holding" permitting prohibitions on felons possessing firearms. *Bruen*, 597 U.S. at 128 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting). Two years earlier, Justices Thomas and Gorsuch also agreed that *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S.Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).

As *Bruen* explained, the courts of appeals had generally adopted a "two-step" Second Amendment framework, first ascertaining whether a law regulates activity falling within the scope of the constitutional right based on its original historical meaning, then applying a means-end scrutiny. 597 U.S. at 19-20. *Bruen* held that, whereas "[s]tep one" is "broadly consistent with *Heller*," "*Heller* and *McDonald* do not support applying means-end scrutiny." *Id.* at 19-24. That aspect of *Bruen*'s holding casts no doubt on this Court's holding in *Torres-Rosario*, which did not rely upon means-end scrutiny.

Because *Bruen*'s "holding decide[d] nothing about who may lawfully possess a firearm," *id.* at 72 (Alito, J., concurring), the Supreme Court's decision plainly does not abrogate this Circuit's prior decisions recognizing that felons may be categorically prohibited from possessing firearms. In fact, several courts have relied upon pre-*Bruen* precedent in rejecting post-*Bruen* challenges to Section 922(g)(1). *See, e.g., United States v. Brillon*, No. 22-2956-cr, 2024 WL 392949, *1 (2d Cir. Feb. 2, 2024) (unpublished) (relying on *United States v. Bogle*, 717 F.3d 281, 281-282 (2d Cir. 2013) (per curium), to reject *Bruen* challenge to § 922(g)(1)); *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023)

(finding that *Bruen* did not abrogate prior decision in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) upholding § 922(g)(1)); *United States v. Dubois*, --- F.4th ---, 2024 WL 927030, *5 (11th Cir. Mar. 5, 2024) (applying *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) to reject *Bruen* challenge). Therefore, *Torres-Rosario* remains binding precedent, and it forecloses defendant's argument.

## C. Even if *Bruen* Had Abrogated this Court's Precedent, Langston Cannot Show Plain Error

Even if *Bruen* required this Court to consider § 922(g)(1)'s constitutionality afresh, defendant could not prevail—particularly on plain-error review. As noted above, to establish plain error, a defendant must show: (1) error; (2) that was plain; (3) which affected his substantial rights; and (4) adversely impacted the fairness, integrity, or public reputation of judicial proceedings. *Clemens*, 738 F.3d at 10. Langston cannot meet this "high hurdle." *Diaz*, 285 F.3d at 95-96.

### 1. There was no error because the Second Amendment permits the dispossession of felons

Strong arguments exist that there was no error by the district court because felon dispossession laws remain constitutional even after *Bruen*. Arguably, felons are not part of "the people" who are entitled to

the protection of the Second Amendment. In Thomas Cooley's "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, Cooley wrote: "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded," including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). For this reason, a felony conviction often results in the "forfeiture of a number of rights" tied to membership in the political community, including not only the right to bear arms, but also "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019); see 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement); *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Alternatively, the Supreme Court's decisions on the subject suggest that the Second Amendment codified only the "right of law-

abiding, responsible citizens" to possess firearms. *Heller*, 554 U.S. at

635. *See also Bruen*, 597 U.S. 9, 26, 29, 70.

Our nation's historical tradition includes severe penalties for

felons, such as execution or forfeiture, which by default would result in

disarmament. *Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining

that, at common law, "virtually all felonies were punishable by death");

4 William Blackstone, Commentaries on the Laws of England 95 (1st

ed. 1769) (discussing "total forfeiture of either lands, or goods, or both"

and capital punishment for felony convictions). Historically, legislatures

have been vested with the authority "to prohibit dangerous people from

possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019)

(Barrett, J., dissenting); *see also* Joseph G.S. Greenlee, *The Historical

Justification for Prohibiting Dangerous Persons from Possessing Arms,*

20 Wyo. L. Rev. 249, 272 (2020) ((observing that in "each [relevant]

historical period," "violent or otherwise dangerous persons could be

disarmed").

The Eighth Circuit has held that "Congress acted within the

historical tradition when it enacted § 922(g)(1) and the prohibition on

possession of firearms by felons." *United States v. Jackson*, 69 F.4th

495, 505 (8th Cir. 2023). If it chooses to address the merits of

Langston's claim, this Court should do the same.

> **2.** **Any error was not plain because there is a split of Circuit authority regarding the constitutionality of § 922(g)(1).**

The Court need not, however, explore the merits in this case

because any error by the district court with respect to the

constitutionality of § 922(g)(1) was not "clear or obvious." *Diaz*, 285 F.3d

at 96. As discussed above, *Torres-Rosario* remains good law in this

Circuit because *Bruen* does not undermine its holding or analysis. To

the extent *Bruen* can be read to undermine *Torres-Rosario*, it does not

do so clearly. *See United States v. Thompson*, 62 F.4th 37, 43 (1st Cir.

2023) (noting a "lack of clarity" about the state of firearms law post-

*Bruen*). In the absence of binding precedent to the contrary, the district

court cannot have committed plain error. *United States v. Romero*, 906

F.3d 196, 207 (1st Cir. 2018) ("With no binding precedent on his side,

[defendant] cannot succeed on plain-error review unless he shows" that

theory "is compelled" by constitutional law, statute, regulation, or other

legal mandate); *United States v. Marcano*, 525 F.3d 72, 74 (1st Cir.

2008) (per curiam) ("[P]lain error cannot be found … absent clear and binding precedent.").

Moreover, a Circuit split exists regarding the constitutionality and scope of § 922(g)(1). *Compare Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) *with Jackson*, 69 F.4th at 505. "As a general principle, if a question of law is unsettled in this circuit, and a conflict exists among other circuits, any error in resolving the question will not be 'plain or obvious.'" *United States v. Crocco*, 15 F.4th 20, 24 (1st Cir. 2021). This lack of uniformity among the circuits is fatal to Langston's plain error argument.

This Court should follow the approach taken by every other circuit to consider this issue on plain error review and deny the defendant's claim. *See, e.g., Brillon*, 2024 WL 392949 at *1 (declining to find plain error because court had "not yet addressed [§ 922(g)(1)'s] constitutionality in light of *Bruen*"); *United States v. Claybrooks*, 90 F.4th 248 (4th Cir. 2024) (no plain error because "contours of *Bruen* continue to solidify in district and appellate courts across the nation, and yet there is no consensus"); *United States v. Galvan*, No. 22-11239, 2024 WL 485701, *1 (5th Cir. Feb. 8, 2024) (unpublished) (rejecting

plain error challenge "[b]ecause there is no binding precedent holding §
922(g)(1) unconstitutional and it is not clear that *Bruen* dictates such a
conclusion"); *United States v. Bowers*, No. 22-6095, 2024 WL 366247, *3
(6th Cir. Jan 31, 2024) (unpublished) ("No binding case law addresses
the constitutionality of § 922(g)(1) in light of *Bruen*, thus precluding a
finding of plain error."); *United States v. Hill*, No. 22-2400, 2023 WL
2810289, *2 (7th Cir. Apr. 6, 2023) (unpublished) ("Because the law is
unsettled," post-*Bruen*, "any error, if there was one, would not be
plain.").

> **3.   There was no effect on Langston's substantial
> rights, because he has not established that he is
> nonviolent.**

Langston also cannot establish that any error affected his
substantial rights, as necessary to satisfy the third prong of plain error
review. Even assuming that *Bruen* could be read to compel the
conclusion that the Second Amendment only permits violent felons to be
prohibited from possessing firearms, that conclusion is of little help to
Langston.

Langston's criminal record and personal history belie his claim
that he is a nonviolent offender who does not pose a danger to others.

D.Br. at 21-23. In fact, Langston has been convicted of no fewer than five felonies, including robbery and drug trafficking, which suggests he is precisely the type of felon for whom disarmament laws are designed.[13] Langston was convicted of robbery under Maine law, a violation of 17-A M.R.S.A. § 651(1)(C), which requires the "use of force … to prevent or overcome resistance." Under *Stokeling v. United States*, 139 S.Ct. 544, 550 (2019) ("we conclude that the elements clause encompasses robbery offenses that require the criminal to overcome the victim's resistance"). And while Langston's two convictions for drug trafficking did not qualify as controlled substance offenses or serious drug offenses due to the quantities involved, SA 266-68, this Court has made clear that guns are "tools of the trade" when it comes to drug trafficking and the connection between guns, drugs, and violence cannot be ignored. *See United States v. Ramirez-Frechel*, 23 F.4th 69, 75 (1st Cir. 2022) (citing cases).

---

[13] Langston ignores his robbery and domestic violence assault convictions in discussing his supposedly "nonviolent" criminal history. D.Br. at 20, 21, 23. The PSR's description of Langston's domestic violence assault, to which he did not object, states that Langston punched his pregnant girlfriend "in the face, causing her head to strike a car window, punched her arm, [and] grabbed her throat with both hands," leaving "visible injuries." SA 265.

Merely the travel of this case reveals the extent of Langston's dangerousness and the risk to the public that would exist if he were allowed to possess firearms. In the course of this matter, Langston; (1) punched a man outside of a bar; (2) went and retrieved a gun before returning to the bar; (3) fought with police officers when they attempted to stop and question him; (4) while on pretrial release, threw his drink on a man in a bar and had to be restrained from hitting him; and (5) got drunk at a casino, in violation of his release conditions, and threatened the casino manager. The factual record below makes clear that, by whatever standard the Supreme Court ultimately establishes with respect to disarmament statutes, Langston is virtually guaranteed to be a prohibited person.

On the basis of the Langston's personal history and criminal record, he cannot demonstrate prejudice with respect to his as-applied challenge to § 922(g)(1). Thus, he has failed the first three prongs of plain error review and this Court should affirm his conviction.

## CONCLUSION

For the above-stated reasons, the judgment below should be affirmed.

Respectfully submitted,

DARCIE N. MCELWEE
United States Attorney

/s/ Benjamin M. Block

Benjamin M. Block
Assistant U.S. Attorney

Dated: March 27, 2024

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS**

CA No. 23-1337

UNITED STATES OF AMERICA

v.

CARL LANGSTON,

TO BE INCLUDED IMMEDIATELY BEFORE THE
CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT

1.     This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below (for example, Wordperfect 8, CG Times, 14 point):
<u>Century Schoolbook , 14 pt</u>

10 1/2 characters per inch, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and characters per inch below (for example, Wordperfect 8, Courier, 10 1/2 CPI):

2.     EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

❏     _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

☒     12,399 Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

❏     _____Lines of Mono spaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line print-out.

<u>  /s/ Benjamin M. Block</u>
Signature of Fi1ing Party

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2024, I electronically filed

Government's Brief with the Clerk of Court using the CM/ECF system,

which will send notification of such filing to the following:

Robert Herrick, Esq.
PO Box 400143
Cambridge, MA 02410


/s/ Brandon Pofahl
Paralegal Specialist