UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

APPEAL NO. 23-1337


UNITED STATES OF AMERICA,
Appellee,


v.


CARL LANGSTON
Defendant-Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

---

REPLY BRIEF OF APPELLANT CARL LANGSTON

---

ROBERT HERRICK, ESQUIRE
Attorney for Carl Langston
PO Box 400143
Cambridge, Massachusetts 02140
Tel: (857) 331-0847
Email: rherricklaw@gmail.com
Bar No. 119803

TABLE OF CONTENTS

TABLE OF AUTHORITIES................................ii

ARGUMENT...........................................1

I.  THE DEFENDANT'S CONVICTION VIOLATES THE SECOND
    AMENDMENT OF THE FEDERAL CONSTITUTION...............1

II. The District Court Erred In Denying The Defendant's
    Motion to Suppress, Because The Portland Police Did
    Not Have Reasonable Suspicion To Detain Him. The
    Fruits of the Unlawful Seizures Should Have Been
    Suppressed.........................................8

CONCLUSION.........................................11

CERTIFICATE OF COMPLIANCE..........................11

CERTIFICATE OF SERVICE.............................11

# TABLE OF AUTHORITIES

*CASES*

Moore v. Madigan,
    702 F.3d 933 (7th Cir. 2012).........................5

N.Y. State Rifle & Pistol Ass'n v. Bruen,
    142 S. Ct. 2111 (2022)......................1, 3, 5, 7

Range v. Attorney Gen. United States,
    69 F.4th 96 (3d Cir. 2023)...........................3

State v. Cook,
    2 A.3d 333 (Me. 2010)................................6

State v. Fox,
    105 A.3d 1029 (Me. 2014).............................6

State v. Nichols,
    79 R.I. 69, 60 A. 763 (1905).........................3

Tennessee v. Garner,
    471 U.S. 1, 13 (1985)................................2

United States v. Al-Maliki,
    787 F.3d 784 (6th Cir. 2015).........................1

United States v. Crocco,
    15 F.4th 20 (1st Cir. 2021)..........................1

United States v. Jackson,
    69 F.4th 495 (8th Cir. 2023).........................5

United States v. Monteiro,
    447 F.3d 39 (1st Cir. 2006).........................10

*FEDERAL CONSTITUTIONAL AMENDMENTS*

Second Amendment...................................1, 4, 7

*FEDERAL STATUTES*

18 U.S.C. § 922...........................................5

*STATE STATUTES*

17-A.M.R.S. § 353.........................................6

*SECONDARY SOURCES*

4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769)...................................2

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868)........4

ARGUMENT

## I. THE DEFENDANT'S CONVICTION VIOLATES THE SECOND AMENDMENT OF THE FEDERAL CONSTITUTION.

In the Government's view, Langston's argument that his conviction violates the Second Amendment must fail because Langston cannot establish that his conviction represents plain error. Gov't Br. at 56, 60 (quoting United States v. Crocco, 15 F.4th 20, 24 (1st Cir. 2021)). It argues, in effect, that Langston cannot satisfy the plain error standard because the statute is not "obviously unconstitutional." United States v. Al-Maliki, 787 F.3d 784, 791, 794 (6th Cir. 2015). Since the Government cannot cite a single statute or regulation that satisfies the historical test set forth in N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2127 (2022), the statute's unconstitutionality is obvious.

Under Bruen's historical test, the Government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127. Rather than pointing to specific firearm regulations dating to the period between the Second Amendment's "ratification through the end of the 19th century,'" id. at 605, the Government relies on the

proposition that felons as a class were subject to dispossession of all their assets, including guns, during the relevant time period. See Gov't Br. at 57-58.

The putative fate of felons at the end of the eighteenth century does not establish a historical tradition of prohibiting felons convicted of nonviolent offenses from possessing firearms. The Government's strained analogy rests on bad history, bad logic and bad law.

First, the Government broadly asserts that "[o]ur nation's historical tradition includes severe penalties for felons, such as execution or forfeiture, which by default would result in disarmament." Gov't Br. at 58, citing Tennessee v. Garner, 471 U.S. 1, 13 (1985) & 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Yet early American lawmakers drew distinctions between different types of felonies, with the punishment varying accordingly.

For instance, the punishment for felony larceny at common law was not dispossession of the defendant's property. Rather, "the stealing of an article of more than twelve pence in value was ... punished by whipping and confinement in the house of correction for the first offence, by branding and such confinement for the second

offence, and by forfeiture of goods and chattels" in an amount proportional to the value of the stolen goods. State v. Nichols, 79 R.I. 69, 60 A. 763, 766 (1905) (citations omitted). The suggestion that the commission of a nonviolent felony led to the seizure of all the offender's assets is demonstrably untrue.

Second, even if a felon were subject to dispossession of all his property, including his guns, such dispossession did not impact his rights to possess firearms following his punishment. As the Fourth Circuit observed in Range v. Attorney Gen. United States, 69 F.4th 96 (3d Cir. 2023)(en banc), "a felon could repurchase arms after successfully completing his sentence and reintegrating into society" so "government confiscation of the instruments of crime (or a convicted criminal's entire estate) differs from a status-based lifetime ban on firearm possession." Id. at 104 (citations omitted).

Finally, the Government's reliance on the categorical exclusion of felons from the rights of citizenship misses the point of the Bruen test, not least because the categorical exclusion rested on an obsolete – and odious – notion linking fundamental rights to the franchise. The Government relies, for instance, on an influential 1868 treatise observing that "[c]ertain classes," including "the

idiot, the lunatic, and the felon," are strangers to the
protections of the Second Amendment. Gov't Br. at 57,
quoting Thomas M. Cooley, *A Treatise on the Constitutional
Limitations Which Rest Upon the Legislative Power of the
States of the American Union* 28-29 (1868). Yet Professor
Cooley's understanding of the constitution also permitted
the exclusion of women, slaves and certain "races" from the
protections of the Bill of Rights, at least until those
blessed with the franchise "s[aw] fit to invite [the
excluded classes] to participate with them in its
exercise." Id. at 28-29.[1]

Langston concedes that the harsh punishments meted out
to some felons in the eighteenth century have persuaded
several courts that a lifetime ban on firearm possession

---

[1] Cooley writes:

> Certain classes have been almost universally excluded
> [from the franchise], - the slave, because he is
> wanting alike in the intelligence and the freedom of
> will essential to the proper exercise of the right;
> the woman from mixed motives, but mainly, perhaps,
> because, in the natural relation of marriage, she was
> supposed to be, and under the common law actually was,
> in a condition of dependence upon and subjection to
> the husband; the infant, for reasons similar to those
> which exclude the slave; the idiot, the lunatic, and
> the felon, on obvious grounds; and sometimes other
> classes for whose exclusion it is difficult to assign
> reasons so generally satisfactory.

Id. at 28.

falls within "the historical tradition that delimits the outer bounds of the right to keep and bear arms." <u>Bruen</u>, 142 S. Ct. at 2127. <u>See</u>, <u>e.g.</u>, <u>United States v. Jackson</u>, 69 F.4th 495 (8th Cir. 2023). Like the Government, these courts point to no firearms regulations imposing a lifetime ban on felons' possession of firearms – and for good reason. There were none.

That other courts have purported to apply the <u>Bruen</u> test in finding 18 U.S.C. § 922(g)(1) constitutional does not preclude a finding of plain error in this case. Under the test set forth by the Supreme Court, the felon-in-possession law is obviously unconstitutional as applied to felons whose charged predicate offenses are nonviolent. The implications of the Supreme Court's analysis in <u>Bruen</u> are plain and must dictate the outcome of this appeal. <u>Cf</u>. <u>Moore v. Madigan</u>, 702 F.3d 933, 935 (7th Cir. 2012)(Posner, J.) (the court of appeals cannot "ignore the implication of the analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home," even where the Supreme Court has not yet carried its reasoning to its logical conclusion).

Unable to meet its burden under the <u>Bruen</u> test, the Government argues that Langston is in fact a violent felon. It contends that "Langston's criminal record and personal

history belie his claim that he is a nonviolent offender who does not pose a danger to the others." Gov't Br. at 61. It further chastises Langston for "ignor[ing] his robbery and domestic assault convictions" in his filings. Gov't Br. at 62 n.13.

Yet the indictment does not charge Langston with a predicate violent felony. Add. 10. Neither unlawful drug trafficking nor theft by unauthorized taking or transfer involves "the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B).[2] Since the judgment of conviction is circumscribed by the indictment, the Government cannot now point to other, uncharged predicates to salvage Langston's infirm conviction. See United States v. McKinney, 60 F.4th 188, 196 (4th Cir. 2023) (an appellate court may not "search for an alternative, valid predicate offense that

---

[2] The Maine offense of theft by unauthorized taking or transfer requires proof that the defendant "(1) obtained or exercised unauthorized control (2) over the property of another (3) with the intent to deprive the owner of that property." State v. Cook, 2 A.3d 333 (Me. 2010), citing 17-A.M.R.S. § 353(1)(A).  The crime of unlawful trafficking in a scheduled drug, in turn, entails "intentionally or knowingly traffick[ing] in what the [defendant] knows or believes to be a scheduled drug, which is in fact a scheduled drug." State v. Fox, 105 A.3d 1029, 1033 (Me. 2014). The Government concedes that the listed drug offense "did not qualify as controlled substance offenses or serious drug offenses due to the quantities involved." Gov't Br. at 62.

the Government did *not* charge as the predicate for the count of conviction") (emphasis in original).

Having failed to charge Langston with a predicate violent felony, the Government is left to make a breezy pronouncement about Langston's unfitness to possess a firearm. It states: "Merely the travel of this case reveals the extent of Langston's dangerousness and the risk to the public that would exist if he were allowed to possess firearms." Gov't Br. at 63.

Yet this type of officious disarmament decree is precisely the vice condemned in Bruen. The United States Attorney's intuition that Langston is a bad candidate for gun possession fails to supply a constitutionally adequate basis for denying him his Second Amendment rights. See Bruen, 142 S. Ct. at 1244 (holding a gun licensure statute unconstitutional where it confers upon authorities the "discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria"). Since the permanent disarmament of felons with nonviolent predicate offenses falls outside the historical tradition of gun regulation, this Court must find that the felon-in-possession statute is unconstitutional as applied to Langston. His conviction cannot stand.

II.  The District Court Erred In Denying The
     Defendant's Motion to Suppress, Because The
     Portland Police Did Not Have Reasonable
     Suspicion To Detain Him. The Fruits of the
     Unlawful Seizures Should Have Been Suppressed.

The Government acknowledges that police officers were acting on "third-hand" information when they detained Langston. Gov't Br. at 28. It contends, however, that the police possessed other, corroborative "information that Langston was looking for the man with whom he previously brawled." Id. A review of the record belies this claim, however, because the off-site manager's third-hand account was the only shred of information that Langston was actively looking to resume a settled dispute.

When they returned to The Bar after initially clearing the scene, officers were acting on two primary sources of information – a neighbor looking out his window and the off-site bar manager. Add. 23-24.[3] The neighbor reported that one of the earlier participants was on the sidewalk in front of the establishment but made no reference to a gun. Add. 15.

The motion judge laid particular emphasis on his finding that officers were responding to "an ongoing and

---

[3] The Bar's security guard had supplied information about the earlier incident but played no known role in prompting police officers to return to the establishment after they had completed their investigation into the altercation. See Add. 23.

imminent threat to public safety." Add. 24. Yet the third-hand tip was the only basis for that finding. It alone added the allegations that:

- Langston had a gun;

- Langston had gone to his car to get the gun; and

- Langston was "looking for another male that he was fighting with."

Id.[4]

Without this third-hand information, there was no threat to public safety, let alone an "ongoing and imminent" one. There was just a report that Langston was acting boisterous outside a bar in a commercial area.

At its core, the motion judge's finding rests on a fatal circularity. Acknowledging that "the police were unable to gauge the reliability of [the manager's third hand tip] directly," he observed that the tip was "detailed and largely predicted what the responding officers found." Add. 23 (emphasis supplied). Contrary to the motion judge's suggestion, the discovery of contraband cannot

---

[4] In the tip, the manager stated:

> One of the males involved in the fight went to his car and grabbed a 1032 gun. He's now looking for another male that he was fighting with. They said he had a pistol in his coat. Black male, 5'10", maroon jacket with a grey hood. He's currently outside the bar with his hand in his pocket.

Add. 16.

retroactively supply the justification for the search that yielded it. Indeed, the exclusionary rule presupposes that a police officer's constitutionally insufficient basis for conducting a search has borne fruit. <u>See</u>, <u>e.g.</u>, <u>United States v. Weidul</u>, 325 F.3d 50, 51-52 (1st Cir. 2005) (affirming grant of motion to suppress loaded gun where the defendant did not voluntarily consent to the search that turned up the weapon).

The motion judge's finding that police officers were confronting an imminent threat to public safety rested entirely on an uncorroborated, third-hand tip and the subsequent discovery of contraband. Since these factors could not supply the officers with reasonable suspicion to conduct a <u>Terry</u> stop, <u>United States v. Monteiro</u>, 447 F.3d 39, 46 (1st Cir. 2006), the denial of the motion to suppress must be reversed.

CONCLUSION

For the forgoing reasons, Langston respectfully requests that this Court reverse the denial of his motion to suppress and his conviction.

CARL LANGSTON
By His Attorney,

/s/ Robert Herrick
ROBERT HERRICK, ESQUIRE
Attorney for Carl Langston
PO Box 400143
Cambridge, Massachusetts 02140
Tel: (857) 331-0847
Email: rherricklaw@gmail.com
Bar No. 119803

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

I, Robert Herrick, counsel for appellant Carl Langston, certify that the forgoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii), and that, according to the word processing system used to prepare the brief, it contains 2,483 words.

/s/ Robert Herrick
ROBERT HERRICK

CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, I electronically filed the Appellant's Reply Brief using the CM/ECF system which will send notification of such filing to Assistant United States Attorney Benjamin M. Block.

/s/ Robert Herrick
ROBERT HERRICK